STATE v. DAVE JARRELL.

(Filed 7 June, 1951.)

**1. Criminal Law § 52a (1)—**

On motion to nonsuit the evidence must be considered in the light most favorable to the State. G.S. 15-173.

**2. Criminal Law § 52a (3)—**

While circumstantial evidence is an accepted instrument in the ascertainment of truth, in order to sustain a conviction it is necessary that the circumstances be of such nature and so connected or related as to point unerringly to defendant's guilt and exclude any other reasonable hypothesis, and it is insufficient when the facts adduced are consistent with defendant's innocence.

**3. Same: Assault § 13—**

Circumstantial evidence which establishes motive and an opportunity of defendant to have committed the offense, and threats made by defendant against the victim of the secret assault, without evidence connecting defendant with the actual execution of the crime, is insufficient to overrule defendant's motion to nonsuit, since the circumstances are entirely consistent with defendant's innocence.

**4. Criminal Law § 52a (2): Assault § 13—**

Where in a prosecution for assault with a deadly weapon, the State introduces testimony of a witness that he was plowing with defendant at the time they heard a shot, the only shot fired that morning in the vicinity so far as the evidence revealed, and also testimony of a statement made by defendant that he knew nothing of the shooting, and there is no evidence directly contrary to this testimony, *held,* the State's own evidence establishes a defense by witnesses offered by it and presented as worthy

of belief, and defendant is entitled to avail himself of such defense on motion of nonsuit. G.S. 14-32.

APPEAL by defendant from *Moore, J.,* at October Term, 1950, of ALLEGHANY.

Criminal prosecution upon a bill of indictment containing two counts, charging substantially that on 10 June, 1947, defendant (1) did in secret manner maliciously assault one Mrs. Peggy Bowman with a deadly weapon, to wit, a 12-gauge shotgun, G.S. 14-31, and (2) did assault Mrs. Peggy Bowman with a deadly weapon, to wit, a 12-gauge shotgun, with intent to kill resulting in injury. G.S. 14-32.

Upon the call of the case for trial, defendant entered a plea of not guilty to the bill of indictment.

Upon trial in Superior Court the State offered evidence tending to show that Mrs. Peggy Bowman was shot, thereby sustaining serious and permanent injury, on the morning of 10 June, 1947, when she was in her strawberry patch picking strawberries; that after breakfast she returned to the field "along about 7:00 or 8:00, or some place"; that there were powder burns on leaves in the edge of the woods, about 75 feet from where she was picking strawberries; that some 12-gauge wads were found in first line with the burned leaves; but that Mrs. Bowman doesn't remember picking strawberries, or what happened.

On the other hand, Mrs. Bowman, testifying as witness for the State, gave this narrative, quoted in part, of events and circumstances in relation to defendant, preceding and subsequent to the time she was shot:

(1) That on 19 May, 1947, when she was out along a rock wall above the house, weeding iris, she saw defendant and his brother, Rufe, come down the road; that defendant had a shotgun; that he "squatted down" beside the wall, and "got to talking" to her, and among other things he said "someone was doing him dirty and he was going to even up, and . . . asked how come so many cars been turning up there at his place"; that she told him that Shine and Lawrence had been plowing her garden and cornfield, and he said, "Well, the next time Vaughn come about for me to tell him that he wanted to see him on some important business,"—she was living on Vaughn's place; (2) That the next morning defendant passed with Coy Kirby; (3) That the next time she saw defendant was "sometime the next week," when she was standing on the porch, churning; that she looked up the road, and saw Robe Cockerham and defendant; that defendant had a shotgun, and set it down at the bottom of the steps; that "he was crying and drunk when he came in there"; that "Robe went out to the locust tree," and defendant "come up on the porch," and said: "I want to talk to you. Did you tell Mr. Vaughn what I told you?"; that upon her reply to the effect that she

had not seen Mr. Vaughn, but had told his wife, mother and son, defendant said: "Well, I thought Lawrence and Shine would be here and start something and I ain't a good fighter any more, but I am a hell of a good shot; I brought the negro with me"; that he went into the room and told Connie, her daughter, he wanted to talk to her; that she, Mrs. Bowman, also went in there, and he told her to sit down on the bed beside him,—"that he wasn't going to hurt me now," and . . . said he understood that someone in Mt. Airy had picked up my pocketbook and read a letter and had turned him over to the Federal, and I told him I didn't do it, and he said, "Well, somebody told him that"; that he said, "Well, he didn't want to talk so much before Connie, that she was too smart anyhow," but he said, "You tell Mr. Vaughn the next time he comes up that if he couldn't get somebody in his house that didn't report him, that we could take the consequences," and I asked him what the consequences were, he said, "You will find out"; that when he started to leave, he said, "Hell, Peggy, if I knew you reported me, I would blow out your damn brains"; that he went out on the porch and down on the steps, and said, "Do you care if I take a drink?"; that she said "No," and he and Robe went to the spring and he took a drink out of a bottle and one out of the dipper, and went on home, "I guess"; (4) That on Sunday morning, about 8 o'clock, after she came home from the hospital, defendant came to her house, and ". . . said, 'If you had been shot with that .12 gun of mine up at the house it would have killed you,' that 'I was shot with a cheap gun' "; and that before he left, he said, "Thank God, Peggy, you didn't die; if you had died the law would send me to the penitentiary for my life." I saw him after that.

Moreover, the State offered evidence tending to substantiate in part, and to corroborate in part, the testimony of Mrs. Bowman.

Connie Holdner also testified that after her mother returned from the hospital, defendant came once, but did not see her, and then he came on Sunday morning; and that when he first walked up on the porch he asked how we were, or something like that, and, talking about her getting shot, he said, "If you knew who shot your mother would you tell?", and I said "No," and he said, "I wouldn't either," and he went on in the room and talked to Mother. (The witness adding statement he made substantially as detailed by Mrs. Bowman as hereinabove related.)

Robe Cockerham, as witness for the State (referring to defendant interchangeably as Mr. Jarrell or Mr. Dave, and Dave), testified on direct examination: That on morning of 10 June, 1947, Mr. Jarrell came in a car to get him to come and plow corn; that they started over to his house, —"I guess around 7:00 or 7:30, somewhere like that, when we got to his house"; that they put harness and things in back end of his car, and went over to his other place, a field between his house and Mrs. Bowman's

house, to catch the horse; that, after some difficulty, the horse was caught, and Mr. Jarrell went in his automobile; that he walked leading the horse, say three-quarters of a mile to where the plowing was to be done; that when he got over there, he saw Mr. Jarrell taking out the harness and cultivating plow; that he pointed out to the sheriff the field "we were plowing in," where Mr. Jarrell's car was parked, and he was taking the harness and things out; that "we plowed" until something about 11:00, maybe after, and that "we did not leave the field at all, only I went up there and got me some water, just a little ways," until Mr. Jarrell left to go to lunch.

On cross-examination this witness, Robe Cockerham, continued by saying, omitting unnecessary repetition: That he lives about three miles from Mr. Jarrell's; that on morning of 10 June, Dave "come over to my house . . . after me . . . to help cultivate corn"; that he got in the car and rode back with him; that he did not see any gun in the car at all; that after catching the horse, "I got over there . . . 15 minutes before or 15 minutes after eight, somewhere along there"; that "where we plowed is across the hill from Mrs. Bowman's,—this side"; that "we started plowing as soon as the horse was hooked up"; that "Mr. Dave was holding the plow and I was leading the horse on account of it was just a colt,—was just 'breaking it' "; that "sometime after we were there I heard a gun . . . one was all . . . I would say about between 9:00 and 10:00 o'clock . . . we hadn't plowed much"; that he has seen the garden, and the strawberry patch up at Mrs. Bowman's,—woods bordering on one side of the garden; that "neither me nor Dave were in the woods after we got out to the field"; that "the woods extend back a long ways, almost to the parkway"; that "when we quit plowing we went straight to Dave's home and to dinner,—a cloud was coming up and we quit early"; that "while we were at Dave's home, the sheriff come. He told me what had happened. We did not have any knowledge of what had happened until the sheriff told us. From the time we got to the field until we left . . . for lunch, Dave was not out of that field. I didn't see Dave with any gun any time that day."

Sheriff Glenn Richardson testified: That about 9:30 on morning of 10 June, Mr. Andy Killiam came and said there had been a shooting down there; that he went immediately,—probably taking 20 minutes to go,—reaching there something like 10 o'clock; that he, accompanied by Dr. Choate, went directly to the house; that, pursuant to information received there, he went immediately to the scene out at the strawberry patch, 200 yards away; that he found powder burned leaves near the strawberry patch, 75 feet from where the lady was picking strawberries, and 12-gauge wads between the powder burns and where the lady was; that the strawberry patch is 1/7th of a mile from the cornfield where defendant was

plowing; that the place where defendant parked his car, as pointed out by Cockerham, to strawberry patch is 1/10th of a mile; that to walk the distance from place "where defendant parked his car," as so pointed out, to the burned leaves, it took him practically four minutes in the woods; and that he had to go up in Dave's meadow 100 to 150 feet from where the car was before he could see the strawberry patch.

Lastly, Guy Scott, member of the State Bureau of Investigation, as witness for the State, testified in part: That he talked with defendant on 18 June in the back room of the sheriff's office, and asked defendant what he knew about the shooting, if anything; that defendant "said he didn't know anything about the shooting"; that he asked if he had been down to Mrs. Bowman's house before or since then, to which defendant replied "Not since," but before that about two weeks he went down and asked her if she was doing the reporting there in the neighborhood, and she told him "no," and then he told her, "Well, if you are, you ought to quit, me and you might get burned out sometime"; that defendant said the man that did the shooting of Mrs. Bowman was as "tall as you are" (meaning witness), and said: "I went and looked at the burned leaves on the edge of the woods." And, the witness concluding said: "I was here when this case was tried before. I didn't testify then."

Defendant offered no evidence, however he reserved exceptions taken to motions aptly made for judgment as in case of nonsuit. G.S. 15-173.

Verdict: Guilty of assault with a deadly weapon with intent to kill, inflicting serious injury not resulting in death.

Judgment: That defendant be confined in the State Prison at hard labor for a term of ten years.

Defendant appeals therefrom to Supreme Court, and assigns error.

*Attorney-General McMullan, Assistant Attorney-General Moody, and Walter F. Brinkley, Member of Staff, for the State.*

*R. F. Crouse and Folger & Folger for defendant, appellant.*

WINBORNE, J.   The statute, G.S. 14-32, declares that "any person who assaults another with a deadly weapon with intent to kill, and inflicts serious injury not resulting in death, shall be guilty of a felony . . ." This is the crime of which defendant stands convicted. The validity of such conviction is challenged by his assignments of error. The one chiefly advanced by him, and properly so, we hold, is based upon exception to the denial of his motion, aptly entered at the close of all the evidence, for judgment of nonsuit in accordance with the provisions of G.S. 15-173.

When the sufficiency of the evidence offered on the trial in Superior Court is so challenged, the evidence is to be taken in the light most favor-

able to the State. And it is noted in the present case that the evidence is both circumstantial and direct.

The State relies upon the circumstantial evidence to sustain the conviction. But the direct evidence offered by the State wholly exculpates the defendant from guilt of the crime charged.

While circumstantial evidence is a "recognized and accepted instrument in the ascertainment of truth," *S. v. Coffey,* 210 N.C. 561, 187 S.E. 754, when the State relies upon such evidence for a conviction of a felony, as in the present case, "the rule is, that the facts established or advanced on the hearing must be of such nature and so connected or related as to point unerringly to the defendant's guilt, and to exclude any other reasonable hypothesis," *Stacy, C. J.,* in *S. v. Harvey,* 228 N.C. 62, 44 S.E. 2d 472, citing *S. v. Stiwinter,* 211 N.C. 278, 189 S.E. 868. See also *S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886; *S. v. Minton,* 228 N.C. 518, 46 S.E. 2d 296; *S. v. Frye,* 229 N.C. 581, 50 S.E. 2d 895; *S. v. Fulk,* 232 N.C. 118, 59 S.E. 2d 617; *S. v. Hendrick,* 232 N.C. 447, 61 S.E. 2d 349; *S. v. Webb, ante,* 382.

The guilt of a person charged with the commission of a crime is not to be inferred merely from facts consistent with his guilt. They must be inconsistent with his innocence. *S. v. Massey,* 86 N.C. 658; *S. v. Harvey, supra; S. v. Webb, supra.*

"Evidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict and should not be left to a jury." *S. v. Vinson,* 63 N.C. 335. See also *S. v. Webb, supra,* and cases there cited.

"Evidence of motive is relevant as a circumstance to identify the accused as the perpetrator of an offense . . . but such evidence, standing alone is not sufficient to carry a case to the jury or to sustain a conviction," *Ervin, J.,* in *S. v. Palmer,* 230 N.C. 205, 52 S.E. 2d 908, and cases cited.

Also evidence of threats, when competent, as in the case in hand, without evidence connecting the defendant with the execution of them, or with the offense charged, is insufficient to take the case to the jury. See *S. v. Rhodes,* 111 N.C. 647, 15 S.E. 1038; *S. v. Freeman,* 131 N.C. 725, 42 S.E. 575.

In the *Rhodes case, McRae, J.,* speaking for this Court, said: "The evidence must be more than sufficient to raise a suspicion or conjecture."

In the light of these principles, the circumstantial evidence shown in the record on this appeal, and on which the State relies, does no more than point a finger of suspicion against defendant. It is entirely consistent with his innocence. It lacks sufficient probative value to support the verdict against defendant.

Now, turning to the direct evidence: It is a settled rule of law in this State that "Where a complete defense is established by the State's evidence, a defendant should be allowed to avail himself of such defense on a motion for judgment as of nonsuit." *S. v. Fulcher,* 184 N.C. 663, 113 S.E. 769. The rule is recognized and applied in these cases: *S. v. Cohoon,* 206 N.C. 388, 174 S.E. 91; *S. v. Todd,* 222 N.C. 346, 23 S.E. 2d 47; *S. v. Baker,* 222 N.C. 428, 23 S.E. 2d 340; *S. v. Boyd,* 223 N.C. 79, 25 S.E. 2d 456; *S. v. Watts,* 224 N.C. 771, 32 S.E. 2d 348; *S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886; *S. v. Robinson,* 229 N.C. 647, 50 S.E. 2d 740.

In the *Robinson case, Barnhill, J.,* writing for the Court, summarized the rule in this manner: "When, however, the State's case is made to rest entirely on testimony favorable to the defendant, and there is no evidence *contra* which does more than suggest a possibility of guilt, or raise a conjecture, demurrer thereto should be sustained," citing cases.

The State, by offering Robe Cockerham as its witness, presents him as worthy of belief. Too, the State by offering the statement of defendant, made to the witness Scott, that "he didn't know anything about the shooting," presented it as worthy of belief. *S. v. Todd, supra. S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886.

And the testimony of Robe Cockerham places defendant in his own field plowing at the time the shot was heard,—the only shot that morning, —so far as the evidence reveals. There is no evidence to the contrary. And defendant is entitled to an acquittal.

For reasons stated the judgment below is

Reversed.