STATE OF NORTH CAROLINA v. NORMAN RAY PARKER

No. 9222SC1143

(Filed 4 January 1994)

**1. Homicide § 284 (NCI4th) — second-degree murder — sufficiency of evidence**

Evidence was sufficient to support defendant's conviction of second-degree murder where it tended to show that defendant constantly maintained surveillance of the victim; defendant possessed two firearms; he engaged in target practice with

the guns shortly before the murder; defendant threatened suicide because the victim had ended her relationship with him; defendant had threatened to kill the victim; defendant was seen by several witnesses in the area of the crime on the morning it was committed; and defendant's brand of cigarette package was found on the opposite side of the road from where the victim's vehicle came to rest.

**Am Jur 2d, Homicide §§ 425 et seq.**

2. **Evidence and Witnesses § 351 (NCI4th)— prior incident involving defendant—admissibility to prove motive and identity**

In a second-degree murder prosecution where defendant contended that the State's circumstantial evidence was insufficient to connect him to the scene of the crime charged and therefore insufficient to identify him as the assailant who killed the victim, the trial court did not err in admitting evidence of an incident involving defendant five years earlier which was substantially similar to the events occurring in this case, since such evidence was admissible as proof of motive and identity. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence §§ 305 et seq.**

Appeal by defendant from judgment entered 7 July 1992 by Judge L. P. Martin, Jr. in Iredell County Superior Court. Heard in the Court of Appeals 14 September 1993.

*Attorney General Michael F. Easley, by Senior Deputy Attorney General Isham B. Hudson, Jr., for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Constance H. Everhart, for defendant-appellant.*

JOHNSON, Judge.

On 4 November 1991, the Iredell County Grand Jury indicted defendant Norman Ray Parker for the second degree murder of Ms. Wanda Kay Welborn. State's evidence showed the following: The victim, Ms. Welborn, was twenty-eight years old and lived with her two children. Ms. Welborn's regular job was at Hunt Manufacturing and Distributing Company but on weekends she also worked as a waitress at Shirin's Restaurant.

STATE v. PARKER

[113 N.C. App. 216 (1994)]

Defendant had been married three times prior to a relationship with Ms. Welborn. At the time of the murder, defendant lived with his parents next to Davis Oil Company on Buffalo Shoals Road in Statesville. Defendant was sometimes an employee of Davis Oil Company but at the time of the murder, he was not working because he was recovering from a hernia operation.

The couple first started dating in February 1991 after Ms. Welborn broke off a relationship with Mr. Jack Kitchens. Prior to the weekend of 30 March, defendant and Ms. Welborn seemed to have a good relationship evidenced by the giving of gifts. On Easter weekend, the couple traveled to Tennessee. Defendant asked Ms. Welborn to marry him, but she refused. When she refused, defendant refused to drive her home unless she married him. Ms. Welborn was eventually able to convince him to return home. Shortly after that incident, defendant moved into Ms. Welborn's mobile home with Ms. Welborn and her two children.

After defendant moved in the home, he became very jealous. He accompanied Ms. Welborn everywhere she went. Defendant watched Ms. Welborn during her entire shift at Shirin's Restaurant. When the owner asked him not to remain in the restaurant, he watched Ms. Welborn through the window. When Ms. Welborn became ill and went into the hospital, defendant monitored Ms. Welborn's telephone calls and her visitors.

Prior to the week she was murdered, Ms. Welborn asked defendant to move out of the mobile home several times but on 22 May 1991, she insisted that he move out. Defendant pulled out a gun and threatened Ms. Welborn telling her "that if he couldn't have her no one would." He refused to relinquish the house keys. After defendant moved out, he continued to call and follow Ms. Welborn in his pickup truck on her way to work.

The week before she was murdered, Ms. Welborn asked her ex-boyfriend to borrow his gun, but Mr. Kitchens never gave her an answer. On Thursday, 23 May 1991, defendant attempted to talk to Ms. Welborn while she ate her lunch but Ms. Welborn would not talk to him.

On the same Thursday, the Iredell Sheriff's Department responded to a call that someone was going to commit suicide and wanted to talk to an officer. Lieutenant R. M. Lambert and Chief Deputy Cook responded to the call and drove out to Homer's

STATE v. PARKER

[113 N.C. App. 216 (1994)]

Truckstop. Defendant drove up and told the officers that he was depressed and was going to kill himself because he and his girlfriend had broken up and life was not worth living. Defendant had a weapon but would not turn it over. After talking to Deputy Cook, defendant calmed down and left.

Defendant talked about committing suicide to several people. In particular, he talked to Mr. Charles Gregg about committing suicide because he had broken up with Ms. Welborn. Mr. Gregg told him to go home and think about it, and defendant said, "Who says I'm the one that's going to get it anyway?"

At various times prior to the murder, defendant had been seen with two pistols: a silver-barreled, dark-handled .380 automatic which he admitted owning, and a silver-barreled, brown-handled larger weapon, said to resemble a black-barreled .357 Taurus magnum revolver. On the Monday before Ms. Welborn's death, defendant had been seen practicing with the .380 automatic and a revolver.

On Friday night, 24 May 1991, defendant left his parents' home, leaving his .380 automatic in his father's possession. He then went to visit a friend, Ms. Jackie Sexton. Ms. Sexton resided at the home of an elderly man as his care giver. She and defendant talked until approximately 10:30 p.m. that night. Ms. Sexton told defendant that he could sleep on the couch in the living room. When Ms. Sexton's daughter, Ms. Sharon Striker, came in at 2:00 a.m., 25 May 1991, defendant was asleep on the couch.

Mr. Keith Wishtichin saw defendant at Shirin's Restaurant around 1:30 a.m. or 2:00 a.m., 25 May 1991. Mr. Wishtichin told defendant he looked like "hell" and that he needed to go home and get some sleep. Mr. Wishtichin later saw defendant around 4:30 a.m. at the truckstop fuel desk.

Between 7:45 a.m. and 8:00 a.m., defendant talked to Ms. Robin Prevette at the fuel desk at Homer's Truckstop. Defendant stated at that time that he had been out all night and had a lot on his mind. The truckstop is 4.9 miles from the scene of the crime.

At 8:00 a.m., Ms. Striker left Ms. Sexton's house for the farmer's market and noticed defendant sitting in the driveway in his pickup truck looking straight ahead. It takes approximately five minutes to travel from Ms. Sexton's house to the truckstop and it is 11 miles from the scene of the crime.

Between 8:30 a.m. and 9:00 a.m., defendant went into Shirin's Restaurant to inquire about Ms. Welborn's whereabouts asking Ms. Donna Shoaf to call him if she came in. Defendant's inquiry seemed to be rehearsed. At 10:00 a.m., defendant told Mr. Archie Cox at the Lake Norman Fuel Stop that Ms. Welborn was dead.

The same morning at approximately 6:28 a.m., Ms. Welborn had stopped at Lake Norman Fuel Stop intersection on Arey Road for coffee. She said she was in a hurry because she was late for work. That was the last time witnesses saw her alive.

At about 6:40 a.m., witnesses in the vicinity of Arey Road heard three shots ring out. One of the witnesses heard squalling tires near the gunfire.

Around 8:30 a.m., Ms. Welborn's car was discovered by Mr. Christopher Beam some 1000 feet off of Arey Road; the gear was in neutral and the car still running. Ms. Welborn was slumped over the wheel of the car and there was blood on the floorboard. There was a cigarette on Ms. Welborn's chest which appeared to have been put out by the blood. Ms. Welborn appeared to have been dead for two hours. There was a wad of money on top of a pocketbook on top of an apron in the passenger's seat.

Further investigation of the scene revealed tire impressions on the pull-off area of the road four hundred feet away from where Ms. Welborn's car came to rest. On the opposite side of the road from the pull-off area, there was a cigarette package and cellophane wrapper. The wrapper came from a pack of Winston Lights. Defendant smoked Winston Lights.

The body was removed from the car for an autopsy and the car was stored. The coroner determined that the cause of death was multiple gunshot wounds.

Defendant was interviewed about 7:40 p.m. on 25 May 1991 by Lieutenant R. M. Lambert. During the interview, defendant stated that it had been months since he had fired a weapon; that he had not killed Ms. Welborn; that he did not know who killed Ms. Welborn; that he had last seen Ms. Welborn on 22 May 1991; and that he had not changed clothes that day.

Contrary evidence introduced showed that defendant had target practice days before the murder, and that he had changed clothing before attending the interview. Witnesses Ms. Robin Prevette and

Ms. Donna Shoaf testified that he had on blue jeans and a red flannel plaid button shirt when they saw him between the hours of 7:30 a.m. and 9:00 a.m. At the time of the interview, defendant had on a pair of blue jeans, a pullover knit shirt and white tennis shoes.

Other evidence for the State showed that Special Agent Joyce Petska, an expert tire track examiner, examined the photographs of tire impressions taken from the scene and compared them to defendant's truck tires. She determined that the pull-off area could not be used for comparison because there appeared to be overlapping impressions, and that the other tire impressions definitely did not match the tread design of defendant's tires. Expert forensic examination of paint samples from areas of minor damage on the right and left front fenders of defendant's truck and left rear of Ms. Welborn's car showed no transfer of paint between the vehicles.

A residue sample was taken from defendant's hands but it was taken too late to be of any value. Special Agent Ronald Marrs, a firearms and tool mark examiner, examined the two guns obtained from defendant's father and compared them to the four bullets recovered from the victim and the victim's car. The bullets had entirely different class characteristics from the State's exhibit 11, the .380, and could not have been fired from that weapon. The bullets exhibited similar characteristics of State's exhibit 10, .357, but the bullets were too deformed for a determination of whether they were fired from that weapon.

On 17 June 1991, defendant talked with Deputy Cook who signed an additional statement basically repeating his innocence and stated that he would submit to a polygraph test. Defendant received a polygraph test.

After a jury trial, defendant was found guilty of second degree murder as charged. From judgment entered 7 July 1992 imposing a sentence of life imprisonment, defendant appealed to this Court.

By defendant's first assignment of error, defendant contends that the trial court erred by denying defendant's motion to dismiss at the close of all of the evidence because the evidence was insufficient as a matter of law to support defendant's conviction for second degree murder. We disagree.

Second degree murder is defined as the unlawful killing of a human being with malice. *State v. Young*, 324 N.C. 489, 380

S.E.2d 94 (1989). The question before us is whether there was sufficient evidence of the unlawful killing of Ms. Welborn by defendant to support a conviction. In *State v. Lynch*, 327 N.C. 210, 393 S.E.2d 811 (1990), our Supreme Court summarized the law applicable to the question before this Court as follows:

> The question is whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense. (Citation omitted.)
>
> Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," (citation omitted). . . .
>
> If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion to dismiss should be allowed. This is true even though the suspicion so aroused by the evidence is strong.

*Id.* at 215, 393 S.E.2d at 814. In determining the sufficiency of the evidence on a motion to dismiss, the evidence must be viewed in the light most favorable to the State.

> The State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion.

*Id.* at 216, 393 S.E.2d at 814.

> We note:
>
> While circumstantial evidence is a "recognized and accepted instrument in the ascertainment of truth," (citation omitted) when the State relies upon such evidence for a conviction of a felony, as in the present case, "the rule is, that the facts established or advanced on the hearing must be of such a nature and so connected or related as to point unerringly to the defendant's guilt, and to exclude any other reasonable hypothesis" (citation omitted)[.]

*State v. Jarrell*, 233 N.C. 741, 746, 65 S.E.2d 304, 307 (1951).

[1]   We find the circumstantial evidence presented by the State was sufficient to support a conviction of second degree murder. The State produced the following evidence which tended to connect defendant with the crime scene and the offense charged to commit the crime: defendant's constant surveillance of Ms. Welborn; defendant's possession of two firearms; defendant's target practice with his guns; defendant's threatened suicide because Ms. Welborn had ended the relationship; defendant's threats to kill Ms. Welborn; defendant's appearance around the area on the morning of Ms. Welborn's death; and defendant's brand of cigarette package found on the opposite side of the road where Ms. Welborn's vehicle came to rest.

The State's evidence, when taken in the light most favorable to the State, tends to show defendant had a motive, connects defendant to the execution of his threats, and shows sufficient facts to connect defendant to the crime charged. Based on these findings, the evidence was sufficient to take the case to the jury. *Jarrell*, 233 N.C. 741, 65 S.E.2d 304. The trial court correctly denied defendant's motion to dismiss.

[2]   By defendant's second assignment of error, defendant contends that he was denied a fair trial by the trial court's admission of irrelevant and inflammatory evidence of defendant's character and unrelated conduct for which he was not on trial and which was not a proper matter for the jury's consideration. We disagree.

After a voir dire examination, the trial court ruled, over defendant's objections, that the testimony of Ms. Tonya Thomas was relevant to show motive, intent, purpose and design, and did not violate Rule 404(b) or Rule 403 of the North Carolina Rules of Evidence. The trial court's ruling was correct.

Rule 404(b) provides:

(b) Other crimes, wrongs, or acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

North Carolina General Statutes § 8C-1, Rule 404(b) (1992).

The preliminary issue to be addressed by the trial court when determining the admissibility of evidence under Rule 404(b) is whether the evidence is in fact being offered pursuant to that rule. *State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986). In the instant case, the State clearly informed the court that it was offering the testimony of Ms. Thomas pursuant to Rule 404(b). The State offered, during the direct examination of Ms. Thomas, extrinsic evidence of prior conduct to prove *modus operandi* and identity of Ms. Welborn's assailant. Therefore, the trial court properly concluded the admissibility of the evidence was to be analyzed initially under Rule 404(b).

Upon a finding the evidence is offered pursuant to Rule 404(b), the court must then determine whether the evidence is relevant. *Morgan*, 315 N.C. at 637, 340 S.E.2d at 91. Extrinsic evidence of conduct is admissible under Rule 404(b) as long as it is relevant for a purpose other than to show defendant has the propensity to engage in the type of conduct charged. *Id.* "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." North Carolina General Statutes § 8C-1, Rule 401 (1992).

Ms. Thomas' testimony was admitted into evidence as proof of motive and identity. When evidence reasonably tends to prove a material fact at issue in the crime charged, it will not be rejected merely because it also proves defendant guilty of another crime. *State v. Jeter*, 326 N.C. 457, 389 S.E.2d 805 (1990). The existence of motive is a circumstance tending to make it more probable that the person in question did the act, hence evidence of motive is always admissible where the doing of the act is in dispute. *State v. Church*, 231 N.C. 39, 55 S.E.2d 792 (1949). Ms. Thomas' testimony helped to establish defendant's motive in killing the victim as it tended to show how defendant acted after he had been rejected and what he was motivated to do in attempting to effect a satisfactory resolution.

"In a criminal case, the identity of the perpetrator of the crime charged is always a material fact." *Jeter*, 326 N.C. at 458, 389 S.E.2d at 806. However, identity is not always at issue. Therefore, before identity is admissible pursuant to Rule 404(b), there must be a determination of whether the identity of the perpetrator is at issue. *State v. Thomas*, 310 N.C. 369, 312 S.E.2d 458 (1984).

STATE v. PARKER

[113 N.C. App. 216 (1994)]

Here, the root of defendant's case is his contention that the State's circumstantial evidence is insufficient to connect him to the scene of the crime charged and therefore, insufficient to identify defendant as the assailant that killed Ms. Welborn. As the identity of the perpetrator is at the heart of this case, Ms. Thomas' testimony as to the motive and identity of the perpetrator is relevant and qualifies under Rule 404(b).

After establishing identity is at issue, and therefore, relevant under Rule 404(b), we must next determine whether the evidence meets the mandate of Rule 403. *State v. Davis*, 101 N.C. App. 12, 398 S.E.2d 645 (1990), *dimissal allowed and disc. review denied*, 328 N.C. 574, 403 S.E.2d 516 (1991). Rule 403 states in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" North Carolina General Statutes § 8C-1, Rule 403 (1992). Defendant argues that the prejudicial value of the evidence outweighed its probative value.

Whether evidence is to be excluded under Rule 403 is left to the sound discretion of the trial court. *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990). "When the incidents are offered for a proper purpose, the ultimate test of admissibility is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403." *State v. White*, 101 N.C. App. 593, 602, 401 S.E.2d 106, 111, *disc. review denied and appeal dismissed*, 329 N.C. 275, 407 S.E.2d 852 (1991).

Here, after Ms. Thomas and Ms. Welborn had rejected defendant in a relationship, defendant kept both women under constant surveillance; threatened to kill both women; threatened to commit suicide over both women; ran both women off of the road with his vehicle; pulled weapons on both women; and in Ms. Thomas' case, stabbed Ms. Thomas with grass shears requiring hospitalization.

Finally, although Ms. Thomas' incident occurred in 1986 and the incident involving Ms. Welborn occurred in 1991, we do not find the incident involving Ms. Thomas to be too remote in time to be more prejudicial than probative. "Remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991).

Under the applicable rules of law, the trial judge correctly admitted the testimony of Ms. Thomas. We find that defendant received a trial free from error.

We find no error.

Judges COZORT and McCRODDEN concur.