STATE OF NORTH CAROLINA v. ROBERT LEE PASTUER, DEFENDANT

No. COA09-1432

(Filed 20 July 2010)

**Homicide— first-degree murder—sufficiency of evidence—circumstantial evidence—suspicion only.**

In a first-degree murder prosecution, the State did not present evidence sufficient to overcome a motion to dismiss where the State's evidence of defendant's opportunity and ability to commit the murder may have raised a strong suspicion of guilt but fell well short of substantial evidence that defendant committed the murder.

Appeal by defendant from judgment entered 13 April 2009 by Judge Henry W. Hight, Jr. in Franklin County Superior Court. Heard in the Court of Appeals 26 April 2010.

*Roy Cooper, Attorney General, by LaToya B. Powell, Assistant Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Charlesena Elliott Walker, Assistant Appellate Defender, for defendant-appellant.*

STATE v. PASTUER

[205 N.C. App. 566 (2010)]

MARTIN, Chief Judge.

Defendant was charged in a bill of indictment with the first-degree murder of his estranged wife, Narskelsky Pastuer. He entered a plea of not guilty, was convicted by a jury, and was sentenced as a Class A felon to life imprisonment without parole. Defendant appeals.

The State's evidence at trial tended to show that defendant and Mrs. Pastuer separated in April 2006 after eleven or twelve years of marriage. According to the testimony of Mrs. Pastuer's daughter, Melissa Battle, defendant had been abusive to Mrs. Pastuer, and she was afraid of him. As a result, Mrs. Pastuer sought assistance from the domestic violence support agency, Safe Space, and met with Karen Branch, an advocate with that agency, on 11 April 2006. During the meeting, Mrs. Pastuer was visibly upset and expressed fear that defendant was going to hurt her. Ms. Branch continued to have telephone conversations with Mrs. Pastuer, offering her support and resources, and on 19 April 2006 she assisted Mrs. Pastuer in obtaining an *ex parte* domestic violence order prohibiting defendant from having any further contact with Mrs. Pastuer. On 8 June 2006, a district court judge entered a final domestic violence protection order, effective until 8 June 2007, providing that defendant was not allowed to "assault, threaten, abuse, follow, harass by telephone, visit[] the home, or work place, or other means, or interfere with [Mrs. Pastuer]." The order gave Mrs. Pastuer possession of the marital residence, located at 49 Lynyrd Lane in Franklin County, and specifically excluded defendant from the premises. Defendant was also ordered to surrender his keys for Mrs. Pastuer's 1998 Camry automobile.

Ms. Branch last spoke with Mrs. Pastuer on 30 October 2006, and Ms. Battle last spoke with her mother on 31 October 2006. When Ms. Battle tried to call again on 1 November 2006, Mrs. Pastuer did not answer. Having been unable to contact her mother for a few days, Ms. Battle filed a missing person report on 8 November 2006. In the early afternoon of the same day, Ms. Battle, accompanied by her husband and two police officers, went to Mrs. Pastuer's house to see if they could discover anything as to her whereabouts. When they arrived, it appeared that no one was home. None of the windows were broken, and the only thing unusual about the front door was damage from a previous altercation with defendant. The officers pried open the front door with a screwdriver and they, along with Ms. Battle, began to search the entire house. They discovered that Mrs. Pastuer's clothes, some jewelry, and her Camry automobile were missing; however other items, such as her undergarments, her shoes, her sleep apnea

breathing machine, the television, and other electronics, remained in the house.

Ronnie Burt, a masonry contractor and acquaintance of defendant, testified that in the late afternoon of a day during the first week of November 2006, he and his masonry crew were on the side of U.S. Highway 1 in Franklin County at a point about a quarter of a mile south of the intersection of that highway with N.C. Highway 96. Mr. Burt had a problem with his truck, and while he was repairing it, he saw defendant walking south along the highway in the direction of Raleigh. Mr. Burt testified that he did not notice anything unusual about defendant's appearance or his demeanor. After he fixed his truck, Mr. Burt gave defendant a ride to New Bern Avenue in Raleigh.

On 4 November 2006, at 4:54 a.m., a man wearing a ski mask, sunglasses, gloves, and a sweatshirt withdrew $400 from Mrs. Pastuer's checking account at the State Employees' Credit Union Cash Point located at 7617 Poole Road in the Raleigh/Knightdale area. In order to make this withdrawal, it was necessary for the person to have both Mrs. Pastuer's ATM card and her personal identification number. The card was not used after this transaction.

On 7 December 2006, Mrs. Pastuer's body was found, wrapped and tied with rope and a blue tarp, in the trunk of her Camry automobile, which was parked behind an abandoned house about one hundred yards from U.S. Highway 1 just south of the town limits of Franklinton. The body was clad only in socks and underwear. The body, tarp, and rope were transported to the Office of the Chief Medical Examiner in Chapel Hill, North Carolina. Dr. Deborah Radisch, Associate Chief Medical Examiner for the State of North Carolina, performed an autopsy on 8 December 2006. Dr. Radisch examined the exterior of the body and, despite the level of decomposition, was able to identify eleven stab wounds. One of the wounds, located on the right side of Mrs. Pastuer's neck, contained a yellow metallic looking material. Mrs. Pastuer died as a result of a stab wound to her abdomen, which traveled "an approximate distance or length in the body of about seven inches." The object that caused this wound "cut a portion of the left lobe of her liver, made a hole in [her] stomach, cut across part of the pancreas and then entered the aorta," causing death in approximately five to ten minutes. Dr. Radisch was unable to determine the exact time of death due to the varying environmental factors to which Mrs. Pastuer's body had been exposed.

STATE v. PASTUER

[205 N.C. App. 566 (2010)]

While conducting the autopsy, Dr. Radisch prepared a rape kit. She likewise collected the yellow material found in the wound in Mrs. Pastuer's neck, a blood sample from Mrs. Pastuer, substances from underneath the nails of Mrs. Pastuer's fifth finger on her right hand and her second finger on her left hand, and jewelry from her hands. She submitted all of these items, along with the blue tarp found around Mrs. Pastuer's body, to the Franklin County Sheriff's Department. The rape kit, blood sample from Mrs. Pastuer, the blue tarp, and samples from underneath Mrs. Pastuer's fingernails were submitted to the State Bureau of Investigation Crime Laboratory ("SBI crime lab") for analysis. There was no presence of semen on any items submitted in the rape kit. There was likewise no evidence of blood found in the sample collected from underneath Mrs. Pastuer's fifth finger on her right hand. The substance found under Mrs. Pastuer's second finger on her left hand preliminarily tested positive for blood, but ultimately "no profile was obtained." The blue tarp found around Mrs. Pastuer's body was compared to two blue tarps found at her house. However, neither of these tarps were a match. No fingerprints were found on the blue tarp, primarily due to the biological material that remained on the tarp from Mrs. Pastuer's body.

On 11 December 2006, Special Agent Rachel Winn, a serologist with the SBI crime lab, performed luminol and phenolpthalein tests at Mrs. Pastuer's residence to search for the presence of blood. These tests gave a positive indication for blood in the utility room, kitchen, and living room. The pattern of the blood in these areas appeared to be "consistent with the outline of a shoe." The trail went through the utility room, into the kitchen where it made a circular pattern, and then continued through the living room to the front door. There was no indication that the blood pattern continued outside of either the utility room door or the front door. The bedrooms, the office, and the bathroom yielded negative luminol results. Special Agent Winn took swabbings from the utility room and the kitchen to submit for DNA testing. Special Agent Michelle Hannon, a forensic biologist with the SBI crime lab, performed DNA testing on these samples and was able to determine that they were a genetic match to Mrs. Pastuer's DNA.

On 21 December 2006, Detective Ralph Almquist, a crime scene investigator with the Franklin County Sheriff's Office, conducted a search of defendant's residence in Zebulon pursuant to a search warrant obtained by SBI Agent Kathryn Anderson. During this search, Detective Almquist seized, *inter alia*, "a pair of . . . [Menz], leather shoes, a pair of white Converse All Star shoes, a pair of Converse

MT75 shoes black in color, Red Wing black work boots, Nike Air Alpha Force . . . shoes, . . . Nike Flight tennis shoes," "an express payment money order[,] . . . black generic wrap-around sun glasses[,] . . . a two-tone gray Boost Motorola cell phone[,] . . . two keys with one rubber surround[,] . . . Kurtz and Blum legal services paperwork[,] . . . [and] a gray Ford Ranger, 2004." From inside the Ford Ranger, Detective Almquist seized a burgundy sweatshirt, three beanie hats, a gray tool box, generic wrap-around polarized sun glasses, a Stanley box cutter, paperwork, a motel receipt, cigarette paper, a Con-Agra Foods early-out request form, a moneygram receipt dated 10 November 2006, and a Raleigh *News and Observer* dated 22 October 2006. Photographs were made of knives found in defendant's home, but the knives were not seized or tested. The presence of blood was detected on the bottom of the right Converse All Star shoe, and Special Agent Hannon was able to obtain a partial DNA profile which matched the DNA profile of Mrs. Pastuer and did not match the DNA profile of defendant. Nothing of relevance was discovered as a result of the tests conducted on the other items.

Detective Almquist also obtained search warrants authorizing Mrs. Pastuer's home to be searched. He seized various items including a Gateway computer; documents from the master bedroom, the computer room, the small guest bedroom, and the kitchen; three disposable cameras; two Nokia cellular phones; two small rugs; various cleaning supplies; two blue tarps; and two vacuum cleaners. Of these items that were actually tested, nothing of significance was found.

Various tests were also performed on Mrs. Pastuer's Camry automobile. Special Agent Karen Morrow, a special agent with the SBI's latent evidence section, searched Mrs. Pastuer's Camry automobile for latent fingerprints and found one palm print and another area of ridge detail, both located on the hood of the car. The area of ridge detail was "non-identifiable" in that "inside the ridge detail there was just not enough there to make a complete comparison and an opinion based on the actual fingerprint." The palm print did not match defendant's known prints, and there was no comparison done between this print and Mrs. Pastuer's known prints because "no elimination prints were submitted." Additionally, swabs taken from the steering wheel of the Camry automobile revealed the presence of Mrs. Pastuer's DNA.

Defendant's motion, made at the close of the State's evidence, to dismiss for insufficiency of the evidence was denied. He did not

present any evidence and renewed his motion to dismiss, which was also denied.

The dispositive issue for decision is whether the State presented substantial evidence at trial to establish that defendant was the person who committed Mrs. Pastuer's murder so as to overcome his motion to dismiss the charge. "This Court reviews the trial court's denial of a motion to dismiss *de novo.*" *State v. Smith,* 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007), *appeal after a new trial,* —— N.C. App. ——, 677 S.E.2d 14 (2009). In conducting this review we must determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Powell,* 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). The evidence must be viewed "in the light most favorable to the state, giving the state the benefit of every reasonable inference that might be drawn therefrom." *State v. Etheridge,* 319 N.C. 34, 47, 352 S.E.2d 673, 681 (1987).

"Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone,* 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). "If the evidence presented is circumstantial, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances." *State v. Thomas,* 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (internal quotation marks omitted). However,

> [i]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion [to dismiss] should be allowed. . . . This is true even though the suspicion so aroused by the evidence is strong.

*Powell,* 299 N.C. at 98, 261 S.E.2d at 117 (citation omitted).

When the evidence establishing the defendant as the perpetrator of the crime is circumstantial, "courts often [look to] proof of motive, opportunity, capability and identity" to determine whether a reasonable inference of defendant's guilt may be inferred or whether there is merely a suspicion that the defendant is the perpetrator. *State v. Bell,* 65 N.C. App. 234, 238, 309 S.E.2d 464, 467 (1983), *cert. granted,* 310 N.C. 626, 313 S.E.2d 592, *aff'd per curiam,* 311 N.C. 299, 316 S.E.2d 72 (1984). In discussing this analysis, this Court has noted that,

"[w]hile the cases do not generally indicate what weight is to be given evidence of these various factors, . . . [i]t is clear, for instance, that evidence of *either* motive or opportunity alone is insufficient to carry a case to the jury." *Id.* at 238-39, 309 S.E.2d at 467. "When the question is whether evidence of *both* motive and opportunity will be sufficient to survive a motion to dismiss, the answer . . . [depends on] the strength of the evidence of motive and opportunity, as well as other available evidence, rather than an easily quantifiable 'bright line' test." *Id.* at 239, 309 S.E.2d at 468. More often, "[e]ach case turns on its own peculiar facts and a decision in one case is rarely controlling in another." *State v. White*, 293 N.C. 91, 95, 235 S.E.2d 55, 58 (1977).

In the present case, the State relied entirely on circumstantial evidence to establish that defendant was the perpetrator of Mrs. Pastuer's murder. Viewing this evidence in the light most favorable to the State, we believe there was arguably sufficient evidence of defendant's motive to murder Mrs. Pastuer; he had displayed hostility towards her, had a history of abusing her, and she was extremely afraid of him to the point of obtaining a domestic violence protective order against him several months prior to her death. *See State v. Lee*, 294 N.C. 299, 303, 240 S.E.2d 449, 451 (1978) (noting that evidence that the "defendant probably beat the victim on two occasions just before her death, and . . . threatened to kill the victim a day or two before her death" "perhaps [demonstrated the defendant's] mental state to have committed this murder"). However, "evidence of [motive] alone is insufficient to survive a defendant's motion to dismiss," *Bell*, 65 N.C. App. at 241, 309 S.E.2d at 469, and evidence of a defendant's opportunity and means to commit the crime must also be considered. *Id.* at 238-39, 309 S.E.2d at 467-68.

Even though the State may have shown a motive for the killing, we are constrained to conclude, after a thorough and careful review of the evidence the State actually offered at trial, that while the evidence of defendant's opportunity and ability to commit the murder may raise a strong suspicion that he is guilty, it falls well short of that required to be substantial evidence that he was the one who committed the murder. Thus, we must hold that the denial of his motion to dismiss was error.

In reaching this conclusion, we are guided by two decisions of our Supreme Court. In *State v. Lee*, 294 N.C. 299, 240 S.E.2d 449 (1978), the evidence presented by the State established that the defendant had beaten the victim a couple of times prior to her death, and, a few days before the murder, the defendant had told someone

he was going to kill the victim. 294 N.C. at 301, 240 S.E.2d at 450. The defendant was also seen in possession of a .25-caliber gun prior to the shooting. *Id.* However, it was never established that the bullet that killed the victim came from a .25-caliber gun, nor was it established that the .25-caliber gun introduced at trial belonged to the defendant. *Id.* There was no physical evidence found at the scene to link defendant to the murder. *Id.* From this, the Court concluded that the State had failed to offer substantial evidence that the defendant was the perpetrator. *Id.* at 303, 240 S.E.2d at 451. In *State v. Furr*, 292 N.C. 711, 235 S.E.2d 193, *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977), the State's evidence showed that the victim and the defendant, the victim's estranged husband, had a hostile relationship. 292 N.C. at 715-16, 235 S.E.2d at 196. Before the victim's murder, the defendant was overheard threatening to kill her, and he even attempted to solicit people to perform the act. *Id.* at 715-17, 235 S.E.2d at 196-97. The victim was later found fatally shot in her home. *Id.* at 717, 235 S.E.2d at 197. Various guns found at both the victim's and the defendant's homes were determined to be unconnected to the crime. *Id.* The defendant possessed a remote control to the victim's garage door, which would explain the lack of evidence of forcible entry into the house, but there were no fingerprints in the house to establish the defendant's presence. *Id.* The defendant had been seen with a women who resembled, but was not positively identified as, the victim on the morning of the murder. *Id.* at 717-18, 235 S.E.2d at 197. After the murder, the defendant was heard saying that the victim "got what she deserved" and that he knew "who did it, but nobody else will ever know." *Id.* at 718, 235 S.E.2d at 198. Because there was a lack of evidence connecting the defendant to the scene of the crime, the Court determined that "the State failed to offer substantial evidence that defendant was the one who shot his wife." *Id.* at 719, 235 S.E.2d at 198 (internal quotation marks omitted).

As with these cases, the evidence offered by the State in the present case fails to connect defendant to the murder. Neither the box cutter or knives found at defendant's house was shown to be involved in the attack on Mrs. Pastuer; in fact, no murder weapon was ever presented to the jury. Moreover, the State offered no evidence in the present case to place defendant at the scene of the murder; while defendant, in the past, had access to Mrs. Pastuer's home and car, he was judicially ordered to stay away from her residence and to surrender the keys to her car, and there was no indication in the record that he had failed to comply with the order. Additionally, there was no evidence presented by the State at trial that defendant was seen

around Mrs. Pastuer's home or in her car any time between 31 October 2006 and 7 December 2006.[1] Defendant's fingerprints were likewise not found in either Mrs. Pastuer's home or in her car.

Furthermore, we do not find the DNA evidence presented in the present case sufficiently connects defendant to Mrs. Pastuer's murder. DNA evidence, like fingerprint and footprint evidence, can be a "certain and scientific method of identification." *Turner v. Commonwealth*, 235 S.E.2d 357, 360 (Va. 1977); *see also State v. Pennington*, 327 N.C. 89, 100, 393 S.E.2d 847, 854 (1990) (holding that DNA evidence was a sufficiently reliable method of proof and thus admissible). Our Supreme Court has held "that when the State relies on fingerprints found at the scene of the crime, in order to withstand motion for nonsuit, there must be substantial evidence of circumstances from which the jury can find that the fingerprints could have been impressed only at the time the crime was committed." *State v. Bass*, 303 N.C. 267, 272, 278 S.E.2d 209, 212 (1981); *see also State v. General*, 91 N.C. App. 375, 379-80, 371 S.E.2d 784, 787 (1988) (noting that "shoe print evidence ha[s] no legitimate or logical tendency to identify an accused as the perpetrator of a crime unless . . . the shoeprints were found at or near the place of the crime[,] . . . the shoeprints were made at the time of the crime[,] and . . . the shoeprints correspond to shoes worn by the accused at the time of the crime"). "The soundness of the rule lies in the fact that such [circumstantial] evidence logically tends to show that the accused was present and participated in the commission of the crime." *State v. Miller*, 289 N.C. 1, 4, 220 S.E.2d 572, 574 (1975).

We believe these principles apply equally to DNA evidence used to identify a defendant as the perpetrator of the crime, and that when the State relies on such evidence for that purpose, it must also provide substantial evidence of circumstances from which the jury could conclude that the DNA evidence could only have been left at the time the crime was committed. In the present case, the State presented

---

1. The record on appeal contains an affidavit in support of an application for a search warrant in which the applicant, an SBI agent, asserted that a neighbor had seen defendant at Mrs. Pastuer's house two or three times after 31 October 2006, and that another neighbor told police that early in the morning of 2 November 2006 she heard a woman scream "Somebody please help me!" and had, about noon that same day, seen a dark gray truck with tinted windows coming from the direction of the house. The affidavit also asserts that Mrs. Pastuer's son-in-law, Talley Battle, told police that he saw defendant driving Mrs. Pastuer's Camry automobile on U.S. Highway 1 while he was on the way home either on Thursday, 2 November 2006 or Friday, 3 November 2006, and that defendant had been wearing a gray hoody and a black toboggan. However, none of this evidence was presented at trial.

evidence that a trail of footprints bearing Mrs. Pastuer's blood was discovered at her residence, giving rise to the inference that she was killed there. The State also presented evidence that Mrs. Pastuer's blood was found on the bottom of one of defendant's shoes. However, the State offered no evidence that defendant was anywhere near Mrs. Pastuer's home at the time she was killed, that the footprints found in the home were those of defendant, or other circumstances from which a jury could conclude that Mrs. Pastuer's blood, and hence her DNA, could only have gotten on defendant's shoe at the time of the murder. The evidence did show, however, that defendant and Mrs. Pastuer had lived together for approximately eleven years, only separating six months prior to her death. The SBI serologist testified that the blood sample from defendant's shoe was degraded, possibly due to the length of time it had been on the shoe, giving rise to the possibility that the blood could have transferred to his shoe during the time they were living together. Though the DNA evidence from defendant's shoe raises a suspicion that defendant killed Mrs. Pastuer, this suspicion alone is insufficient to be deemed substantial evidence that defendant was the perpetrator, *Powell*, 299 N.C. at 98, 261 S.E.2d at 117, especially considering the fact that the State's evidence indicated that the blood could have transferred to defendant's shoe prior to the murder and there was no other "evidence of circumstances from which the jury c[ould] find that the [DNA] could have been [acquired] *only* at the time the crime was committed." *Bass*, 303 N.C. at 272, 278 S.E.2d at 212 (emphasis added).

The additional evidence that defendant was seen walking down U.S. Highway 1 in Franklin County sometime around the time of Mrs. Pastuer's disappearance, and that her body was found sometime later at an abandoned house in the vicinity of the same highway, only adds to the suspicion surrounding defendant's guilt; it does not supply substantial evidence that he was the perpetrator. Likewise, the evidence surrounding the use of Mrs. Pastuer's ATM card does not definitively connect defendant to the crime; there was no evidence that the card was taken at the time of her murder or that defendant was the person who used the card.

In arguing that it presented substantial evidence of defendant's identity as the perpetrator, the State has cited *State v. Lowry*, —— N.C. App. ——, 679 S.E.2d 865, *cert. denied*, 363 N.C. 660, 686 S.E.2d 899 (2009), and *State v. Parker*, 113 N.C. App. 216, 438 S.E.2d 745 (1994). Understanding well the brutality of the crime of which defendant was convicted and the gravity of the decision which we must

reach in this case, we have carefully considered these cases and conclude they are distinguishable and offer no support for the State's position. In *Lowry*, the State presented evidence that

> (1) defendant . . . [was] in possession of the victim's car shortly after the probable time of her death, (2) defendant . . . ha[d] possession of other property (jewelry and an ATM card) belonging to the victim that would have likely been taken at the time of the victim's death, (3) defendant [had] familiarity with the victim's house and access to the house the days before the murder, and (4) defendant . . . [made an] effort to eliminate evidence by wiping down the car and [fled] when confronted by police.

—— N.C. App. at ——, 679 S.E.2d at 873. From this evidence, this Court concluded that there was sufficient evidence from which a jury could conclude that defendant was the perpetrator of the crime. *Id.* at ——, 679 S.E.2d at 873. In the present case, however, defendant was not found in possession of any of Mrs. Pastuer's property after her death. Though there was evidence that *a* man used Mrs. Pastuer's ATM card the first week of November 2006, there was no evidence identifying defendant as the person who used the card, that this transaction occurred after her death, or that the card was taken at the time of her murder. Likewise, there was no evidence presented that defendant had been in Mrs. Pastuer's car anytime after she went missing.

In *Parker*, the State presented evidence of

> defendant's constant surveillance of Ms. Welborn; defendant's possession of two firearms; defendant's target practice with his guns; defendant's threatened suicide because Ms. Welborn had ended the relationship; defendant's threats to kill Ms. Welborn; defendant's appearance around the area on the morning of Ms. Welborn's death; and defendant's brand of cigarette package found on the opposite side of the road where Ms. Welborn's vehicle came to rest.

113 N.C. App. at 223, 438 S.E.2d at 749-50. Thus, there was substantial circumstantial evidence linking defendant to the scene of the murder. *Id.* at 223, 438 S.E.2d at 749. The evidence presented at defendant's trial did not place him at the scene of the murder; there was no evidence presented to the jury that defendant had been seen around Mrs. Pastuer's house or in her car anytime around the time of her murder, and, as discussed, the DNA evidence provided no evidence of his presence there at the time of the crime.

Viewing the entirety of the evidence presented to the jury in the light most favorable to the State, we agree that it "excite[s] suspicion in the just mind that [defendant] is guilty," but it falls well short of the State's burden to provide substantial evidence that defendant was the perpetrator of this crime. *Lee*, 294 N.C. at 303, 240 S.E.2d at 451 (internal quotation marks omitted); *see also Powell*, 299 N.C. at 98, 261 S.E.2d at 117 (requiring substantial evidence of the defendant's identity as the perpetrator of the crime in order to survive a motion to dismiss).

Reversed.

Judges JACKSON and BEASLEY concur.