STATE OF NORTH CAROLINA v. DONALD CARLTON LOWRY, DEFENDANT

No. COA08-845

(Filed 4 August 2009)

**1. Homicide— first-degree murder—motion to dismiss—sufficiency of evidence—identity as perpetrator—financial motive and opportunity**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder even though defendant contends there was insufficient evidence of defendant's identity as the perpetrator because the State presented ample evidence of both financial motive and opportunity such that a reasonable juror could have concluded that defendant was the person who killed the victim including: (1) defendant being in possession of the victim's car shortly after the probable time of her death, (2) defendant having possession of other property, jewelry and an ATM card, belonging to the victim that would have likely been taken at the time of the victim's death, (3) defendant's familiarity with the victim's house and access to the house the days before the murder, and (4) defendant's effort to eliminate evidence by wiping down the car, and his flight when confronted by police.

**2. Homicide— first-degree murder—felony murder—robbery—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder under the theory of felony murder because: (1) our appellate courts have held that evidence that a victim's wallet or purse was found emptied at the crime scene is sufficient to show that a robbery occurred at the time of the murder; and (2) the State's evidence was sufficient to allow a reasonable jury to find that the victim was killed during the commission of a robbery.

Appeal by defendant from judgments entered 24 August 2007 by Judge Robert H. Hobgood in Pasquotank County Superior Court. Heard in the Court of Appeals 10 March 2009.

Attorney General Roy Cooper, by Special Deputy Attorney General Diane A. Reeves, for the State.

D. Tucker Charns for defendant-appellant.

GEER, Judge.

Defendant Donald Carlton Lowry timely appealed his convictions of first degree murder and larceny of a motor vehicle. In his brief on appeal, however, defendant argues only that the trial court erred in denying his motion to dismiss the first degree murder charge. Because, when all inferences are drawn in favor of the State, the State presented sufficient evidence from which a reasonable jury could conclude that defendant killed the victim during the course of and in furtherance of a robbery, we find no error.

Facts

On 22 August 2007, a jury convicted defendant of first degree murder, felonious larceny of a motor vehicle, and felonious possession of a stolen motor vehicle. The victim of these crimes was Carolyn Dawson, a 75-year-old retired music teacher. The Chief Medical Examiner determined that Ms. Dawson was killed on Monday, 19 September 2005.

At trial, the State's evidence tended to show the following facts. Ms. Dawson lived alone on Flora Street in Elizabeth City, North Carolina. Defendant knew Ms. Dawson and had been in her house on several occasions because he had previously done yard work for her.

On Friday, 16 September 2005, defendant brought several pieces of jewelry to sell to Milton Sawyer, who ran an antique business in Elizabeth City. Defendant told Mr. Sawyer that a friend or cousin was getting rid of some jewelry and that there was more jewelry to sell. When Mr. Sawyer asked if they could go over to the friend's or cousin's house to look at the rest of the jewelry, defendant said they could not do that. Mr. Sawyer paid defendant $90.00 to $100.00 for the jewelry, which included a star ruby ring.

On Saturday, 17 September 2005, Ms. Dawson's daughter, Renee Dawson, visited her mother at her home on Flora Street. During the visit, Ms. Dawson told Renee that she was missing her star ruby ring. At trial, Renee identified the star ruby ring sold to Mr. Sawyer by defendant as the ring belonging to her mother. On that same Saturday,

Cathy Weaver, Ms. Dawson's neighbor and friend, spoke with Ms. Dawson outside her house.

On Sunday, 18 September 2005, Diana Gallop, a friend of the family, saw Ms. Dawson at church. Emma York, Ms. Dawson's cousin, spoke to Ms. Dawson by telephone on Sunday evening. That same day, defendant asked someone for a ride to Flora Street and was seen walking down the road toward Flora Street in the early afternoon. At about 3:00 p.m. on Sunday, defendant called Mr. Sawyer and told him he had gotten some more jewelry. Mr. Sawyer picked defendant up on the side of the road, and they went to Mr. Sawyer's store. Mr. Sawyer paid defendant $50.00 or $60.00 for the second set of jewelry. Mr. Sawyer then took defendant to Bojangles and bought him a drink.

On Monday, 19 September 2005, Jennifer Peserick, who delivered the newspapers on Flora Street, put the paper in front of Ms. Dawson's door between 8:30 and 9:30 a.m., as she did every morning. Ms. Peserick noticed nothing unusual when she delivered the paper that Monday. The mailman dropped off the mail as usual on Monday morning and also noticed nothing out of the ordinary about Ms. Dawson's house.

Rebecca Neece, Ms. Dawson's sister, testified that Ms. Dawson's daily routine was to get up around 7:00 a.m. She would then fix a bowl of cereal and a banana for breakfast and read the newspaper while watching television in her pajamas until around 10:00 a.m. At that point, she would go upstairs to get dressed for the day.

On Monday morning, Ms. Weaver—Ms. Dawson's neighbor—attended a class at Elizabeth City State University and came home afterwards between 10:00 and 10:30 a.m. She was planning to take over a piece of pie and a birthday card to Ms. Dawson's house since Ms. Dawson had recently had a birthday. Ms. Dawson usually parked her silver Buick in the driveway, but since Ms. Weaver did not see the Buick, she decided to wait to go visit. Although Ms. Weaver looked for Ms. Dawson's car on and off during the day, she never saw it in the driveway.

At about 10:30 or 11:00 a.m. on Monday morning, Duggie Johnson saw defendant driving a "gray-blue" car. George Overton also saw defendant drive by in a four-door silver or gray car between 1:00 and 3:00 p.m. on that day. He testified that this was unusual because defendant usually rode a bicycle or asked others for rides. After being shown a photograph of Ms. Dawson's car, Mr. Overton said that it

looked like the car defendant was driving. Mr. Overton testified that he saw the same car parked on Martin Street early the following Wednesday morning. Jerry Lewis, the owner of a junk car business, testified that on or about that Monday, defendant offered to sell him an old car for around $500.00.

Anika Edwards, who had previously dated defendant, testified that on Tuesday, 20 September 2005, defendant came to the house on Martin Street where she lived with her mother, Vicki Edwards, at 8:05 a.m. after Anika had put her children on the school bus. He was driving a "silvery" Buick that she had never seen him drive before.

At a little before or after 10:00 a.m. on Tuesday morning, 20 September 2005, defendant came to Mr. Sawyer's store with a third collection of jewelry, for which Mr. Sawyer paid him $40.00. Renee Dawson subsequently testified that the items of jewelry sold to Mr. Sawyer by defendant were items she recognized as belonging to her mother.

Ms. Edwards testified that defendant returned to her house that morning to bring her a sandwich and stayed at her house for an hour or two. He went back a third time around 2:30 p.m., and a fourth time around 6:00 p.m. According to Ms. Edwards, when defendant came to her house the second, third, and fourth times, he was walking and she did not see a car. She also testified that she saw the silver Buick she had previously seen defendant driving parked three houses down the street from her house.

Ms. Dawson's bank records showed that on Tuesday, 20 September 2005, someone used her bank card to attempt to withdraw $100 and $40 at the Gateway Bank at 400 West Ehringhaus Street and $100 at the Gateway Bank at 1404 West Ehringhaus Street. The video surveillance matching up with the date and time of those transactions showed a man attempting to use the ATM. The man on the video was wearing the same clothes and hat that defendant was wearing that day, and he matched the physical description of defendant.

When the mailman arrived at Ms. Dawson's house on Tuesday morning at around 11:30 a.m. to deliver the mail, there was a newspaper on the porch. He had never seen one there before when delivering the mail. Additionally, when he "went to put the mail in the box, there was still mail in there from the day before and that struck [him] as unusual." The mailman did not see Ms. Dawson's car in the driveway.

Ms. Weaver was also concerned when she noticed Ms. Dawson's car was still not in the driveway on Tuesday morning. Although Ms. Dawson usually asked Ms. Weaver to pick up her mail and newspapers when she went out of town, Ms. Dawson had not indicated she would be going out of town. She was concerned because Tuesday's newspaper was still on the porch, and Monday's mail was in the mailbox. Ms. Weaver called Ms. Dawson's sister and daughter to express her concern. At their request, she went over to check on Ms. Dawson that afternoon.

When Ms. Weaver found the front door of Ms. Dawson's house locked, she went around to the side of the house and went in through the unlocked kitchen door. Ms. Weaver walked around the first floor of the house calling for Ms. Dawson. She left the house through the kitchen door and called Renee Dawson to tell her that she could not find her mother. While Ms. Weaver was on the phone with Renee Dawson, Ms. Neece arrived, went in the house, and came back out, saying she had found Ms. Dawson's dead body.

The two women went back into the house and found Ms. Dawson slumped over in the armchair in front of her television wearing her nightgown and robe. Ms. Dawson had suffered "a blow to the top of her head and her hair was matted with blood and there was maybe a little blood in the chair, but on her back and also it looked like she had been hit in the side of the face too." The two women left the house and called 911 from the yard.

Lieutenant John Etheridge arrived at Ms. Dawson's house at around 4:00 p.m. that afternoon. When more officers arrived, they cleared the house to make sure no one else was inside and then secured the scene. Between 6:45 and 7:15 p.m. that evening, Etheridge put out a call to other officers to "be on the lookout" ("BOLO") for Ms. Dawson's silver Buick.

SBI Agent Anthony Jernigan searched the crime scene. He found Ms. Dawson's body "sitting upright or partially upright with her head more in a slumped over or a bent position with the head being—leaning over toward the right shoulder." He testified that she was wearing "a floral type of robe and a white nightgown" and that there was a "considerable amount of blood that was located on her head primarily on the rear portion of her head." Near the body, Jernigan found a magazine and "various credit card and bank statements and some other bill type statements," as well as a newspaper dated Monday, 19 September 2005.

Usually, when Ms. Dawson sat in the armchair where she was found, she had her large pocketbook right next to her feet. The pocketbook had many compartments in which she carried "everything in there that was important, bills, papers, insurance things, everything like that." The purse was not found at the crime scene and was never recovered.

While observing Ms. Dawson's body, Jernigan found "two [2] indentations, indented areas, on the back of her head, one [1] more toward the top and another one [1] a little lower on the back of her head." (Bracketed material original.) There was a piece of wood lying in Ms. Dawson's lap. The agent noticed two baseball bats in the house, one near the kitchen door and one near the front door. He testified that the piece of wood that was located on Ms. Dawson's lap appeared "consistent with the bat that was located at the rear door of the residence." He testified that "[t]here was some splintered areas on this bat and upon comparing or observing the piece of wood that had been in her lap and comparing it to the bat and again it appeared to be consistent with the bat." Finally, Jernigan said that "[t]here were some hairs that were located on both bats which were collected during the crime scene search." SBI Agent Lucy Milks testified that the hair found on the bats taken from Ms. Dawson's house matched Ms. Dawson's hair. SBI Agent Jennifer Remy testified that the piece of wood found on Ms. Dawson's lap matched wood from the bats and also appeared to fit in the hole in one of the bats.

The search of the crime scene also revealed some jewelry lying in an open drawer and on top of the dresser in a downstairs bedroom. Neither door of the house showed any sign of forced entry, but a single piece of glass had been removed from the back door such that one of the officers could slide his hand through and open the door.

Deputy Jeremy Reed heard the BOLO issued for Ms. Dawson's car and later on Tuesday evening found a car matching its description parked on South Martin Street in front of the houses numbered 800 to 801. Anika and Vicki Edwards lived at 707 South Martin Street.

Officer Glenn Needham was assigned to set up surveillance on the car. At approximately 2:15 a.m. on Wednesday, 21 September 2005, he observed a black male, whom he later identified as defendant, approach the car on foot. Defendant stood in front of the car for a second and then opened the door on the driver's side. He took a rag and seemed to make a wiping motion. He leaned partially into the passenger area of the car, and "[i]t appeared as [if] he was reaching

for something on the right side of the steering wheel and collected an unknown item." He then locked the car's doors, turned his head to the right and left, and started walking quickly down the street.

Officer Needham got out of his car and started jogging at a low crouch after defendant, hiding behind parked cars as he ran. At some point, defendant looked over his shoulder and began to run. Officer Needham sprinted after defendant, identifying himself as the police and ordering defendant to stop running. Officer Needham was dressed in SWAT gear that included a vest with the words "POLICE."

Defendant ran behind the house located at 707 South Martin Street, and Officer Needham found him flat against the wall in the yard. Officer Needham pointed his gun at him and told him to show him his hands. As defendant complied, he threw a set of keys that were later determined to belong to Ms. Dawson's car. Officers also found a towel lying next to where the keys had landed. Defendant was arrested and taken into custody.

Azree Jones was the next door neighbor of Vicki and Anika Edwards. About a year after Ms. Dawson's death, Ms. Jones found a grocery bag containing credit cards with Ms. Dawson's name on them in her backyard dog pen. Ms. Jones believed that her dog had likely pulled the bag through the fence so that he could chew on the cards. Several of the cards had bite marks on them.

Defendant was charged with first degree murder, felonious larceny of a motor vehicle, and felonious possession of a stolen motor vehicle. Defendant was tried capitally in Pasquotank Superior Court. The parties stipulated that, among other things, (1) there was no blood on defendant's clothing when he was arrested; (2) there was no transfer of hair or fibers between defendant and Ms. Dawson; (3) there were no latent fingerprints on the bats or the wood fragments from the bats; and (4) there were no identifiable latent prints from Ms. Dawson's house or the car.

At trial, in addition to the above evidence, the State presented the testimony of the medical examiner, Dr. Gilliland. Dr. Gilliland testified that Ms. Dawson's head injuries were caused by a "blunt force impact" with an instrument that had a "round or rather broad surface." Ms. Dawson's injuries indicated that she had been hit from behind and that "her upper trunk and head were upright at the time." There was no evidence of any defensive injuries to the body. Dr. Gilliland also testified that Ms. Dawson's skull was not fractured by the blows to her head, meaning that "these were relatively

mild blunt force injuries of the head." Dr. Gilliland said that the injuries to Ms. Dawson "would not be expected to cause the death of a healthy individual."

It was Dr. Gilliland's opinion that "Carolyn Dawson died as the result of blunt force injuries of the head. But significant contributing factors were the hypertensive and arterial sclerotic cardiovascular disease, the heart disease caused by high blood pressure and hardening of the arteries." Dr. Gilliland concluded with reasonable medical certainty that Ms. Dawson was killed on Monday, 19 September 2005.

At the conclusion of the State's evidence, defendant moved to dismiss the murder and larceny of a motor vehicle charges. That motion was denied. Defendant did not present any evidence and renewed his motion to dismiss, which was again denied. The jury found defendant guilty of first degree murder under the theory of premeditation and deliberation and under the felony murder rule. Defendant was also convicted of felonious larceny of a motor vehicle and felonious possession of a stolen motor vehicle.

Following the sentencing hearing, the jury found the one aggravating circumstance submitted by the State: that the murder was committed for pecuniary gain. The jury then found 17 of the 18 mitigating circumstances on which it was instructed, but concluded that the mitigating circumstances were insufficient to outweigh the aggravating circumstance. The jury did not, however, unanimously find that the aggravating circumstance was sufficiently substantial to call for the death penalty, when considered with the mitigating circumstances. The jury, therefore, recommended a sentence of life imprisonment without parole.

The trial court sentenced defendant to life in prison without parole for the murder conviction, but arrested judgment on the felony possession of a stolen motor vehicle charge. The trial court also imposed a concurrent presumptive-range sentence of 14 to 17 months imprisonment for the larceny of a motor vehicle charge. Defendant gave notice of appeal in open court.

## Discussion

Defendant challenges the trial court's denial of his motion to dismiss the charge of first degree murder for insufficiency of the evidence. Defendant does not contest his conviction of larceny of a motor vehicle. "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d

29, 33 (2007). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Powell,* 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). Substantial evidence is that amount of evidence "sufficient to persuade a rational juror to accept a particular conclusion." *State v. Goblet,* 173 N.C. App. 112, 118, 618 S.E.2d 257, 262 (2005).

"The trial court in considering such motions is concerned only with the sufficiency of the evidence to carry the case to the jury and not with its weight." *Powell,* 299 N.C. at 99, 261 S.E.2d at 117. When the evidence is circumstantial, "[t]he trial court's function is to test whether a reasonable inference of the defendant's guilt of the crime charged may be drawn from the evidence." *Id.* (emphasis omitted). *See also State v. Rowland,* 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965) ("[I]t is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty."). The Court views the evidence in the light most favorable to the State. *State v. Hyatt,* 355 N.C. 642, 666, 566 S.E.2d 61, 77 (2002), *cert. denied,* 537 U.S. 1133, 154 L. Ed. 2d 823, 123 S. Ct. 916 (2003).

I

**[1]** Defendant's first contention on appeal is that the State failed to present sufficient evidence from which a reasonable jury could find that defendant was the person who murdered Ms. Dawson. Defendant argues this case is substantially similar to five cases in which the Supreme Court held that the State failed to sufficiently prove that the defendant was the perpetrator of the crime. *See State v. Lee,* 294 N.C. 299, 240 S.E.2d 449 (1978); *State v. White,* 293 N.C. 91, 235 S.E.2d 55 (1977); *State v. Furr,* 292 N.C. 711, 235 S.E.2d 193, *cert. denied,* 434 U.S. 924, 54 L. Ed. 2d 281, 98 S. Ct. 402 (1977); *State v. Cutler,* 271 N.C. 379, 156 S.E.2d 679 (1967); *State v. Bell,* 65 N.C. App. 234, 309 S.E.2d 464 (1983), *aff'd per curiam,* 311 N.C. 299, 316 S.E.2d 72 (1984).

In *Cutler,* 271 N.C. at 383, 156 S.E.2d at 682, however, the Supreme Court cautioned that when determining whether the evidence in a criminal case is sufficient to send the case to the jury,

controlling principles of law are more easily stated than applied to the evidence in a particular case. Of necessity, the application must be made to the evidence introduced in each case, as a

whole, and adjudications in prior cases are rarely controlling as the evidence differs from case to case.

In *Bell*, 65 N.C. App. at 237, 309 S.E.2d at 466, this Court also noted the difficulty in addressing the sufficiency of the evidence in murder cases such as this one, where the State has presented only circumstantial evidence.

The *Bell* Court explained:

The real problem lies in applying the test to the individual facts of a case, particularly where the proof is circumstantial. One method courts use to assist analysis is to classify evidence of guilt into several rather broad categories. Although the language is by no means consistent, courts often speak in terms of proof of motive, opportunity, capability and identity, all of which are merely different ways to show that a particular person committed a particular crime. In most cases these factors are not essential elements of the crime, but instead are circumstances which are relevant to identify an accused as the perpetrator of a crime.

*Id.* at 238, 309 S.E.2d at 467. The Court continued: "While the cases do not generally indicate what weight is to be given evidence of these various factors, a few rough rules do appear. It is clear, for instance, that evidence of *either* motive or opportunity alone is insufficient to carry a case to the jury." *Id.* at 238-39, 309 S.E.2d at 467. On the other hand, "[w]hen the question is whether evidence of *both* motive and opportunity will be sufficient to survive a motion to dismiss, the answer is much less clear. The answer appears to rest more upon the strength of the evidence of motive and opportunity, as well as other available evidence, rather than an easily quantifiable 'bright line' test." *Id.* at 239, 309 S.E.2d at 468.

All of the cases cited by defendant fall under the general rule expressed in *Bell* that a defendant's motion to dismiss should be allowed when the State presents only evidence of *either* motive *or* opportunity. In *Bell*, *White*, and *Cutler*, the State presented evidence of opportunity without presenting any evidence of the defendant's motive for the murder. *See Bell*, 65 N.C. App. at 241, 309 S.E.2d at 469 ("In sum, the evidence taken in the light most favorable to the state at the most shows only defendant had an opportunity to kill the victim. As discussed above, evidence of opportunity alone is insufficient to survive a defendant's motion to dismiss."); *White*, 293 N.C. at 96-97, 235 S.E.2d at 59 (noting that "no motive was estab-

lished for the crime[,]" "no flight was attempted by the defendant[,]" and the State only "established that the defendant had an opportunity to commit the crime charged"); *Cutler*, 271 N.C. at 384, 156 S.E.2d at 682 ("There is no evidence to show ill will between the deceased and the defendant or any other motive for the defendant to assault or kill the deceased.").

In *Furr* and *Lee*, on the other hand, the State presented evidence of motive, but not opportunity. *See Lee*, 294 N.C. at 303, 240 S.E.2d at 451 (holding that while evidence that defendant threatened to kill victim two days before her death and had previously been violent toward her was enough to establish motive, "[t]he criminal act cannot be inferred from evidence of state of mind alone" when State presented no evidence placing defendant at murder scene); *Furr*, 292 N.C. at 718-19, 235 S.E.2d at 198 ("The evidence shows that defendant wanted his wife dead; that he actively sought her death; and that he harbored great hostility toward her. This, however, without more is not enough to permit a jury to find that he killed her.").

In contrast to those cases, the State in this case presented ample evidence of *both* motive and opportunity. First, the State presented evidence that defendant had a financial motive for killing Ms. Dawson. Although defendant was not known to have a car and usually rode a bike or asked for rides, he was seen driving a car ultimately determined to be Ms. Dawson's car on the day of and the day after her murder and offered to sell a car to a junk car dealer.

In addition, Ms. Dawson's purse, which she usually kept by her side while sitting in her chair at home, was missing when her body was discovered. On the day after her murder, a man matching defendant's description was captured on surveillance video using Ms. Dawson's bank card at two ATMs attempting to withdraw $240. A bag containing Ms. Dawson's bank cards was later recovered in the yard next to the house where defendant had visited his former girlfriend several times the day after the murder and where he was arrested.

On the Friday and Sunday before the murder, defendant sold Mr. Sawyer several items of jewelry belonging to Ms. Dawson for cash, telling Mr. Sawyer there was more jewelry, but refusing to take Mr. Sawyer to go see it. On the morning after Ms. Dawson was killed, defendant sold Mr. Sawyer more jewelry belonging to Ms. Dawson.

All of this evidence, taken together, was sufficient evidence to allow the jury to conclude that defendant had a financial motive to

kill Ms. Dawson. *See State v. Ledford*, 315 N.C. 599, 614, 340 S.E.2d 309, 319 (1986) (holding State's evidence was sufficient to send issue of defendant's identity as the perpetrator of a murder to the jury when defendant displayed roll of money after defendant was seen stepping onto sidewalk in front of victim's house; defendant had a $100 bill, four $50 bills, six $20 bills, and one $1 bill in his possession when he was arrested; and victim left couple of $100 bills, several $50 bills, and several $20 bills in jar in home on Wednesday prior to assault); *State v. Barnett*, 141 N.C. App. 378, 384, 540 S.E.2d 423, 428 (2000) (holding that State's evidence that defendant had been unemployed prior to murder, had been drinking and using drugs before murder, and only had loose change in his possession on morning of murder "permitted the inference that defendant was in need of money and robbed and murdered the victim to obtain that money"), *appeal dismissed and disc. review denied*, 353 N.C. 527, 549 S.E.2d 552, *aff'd per curiam*, 354 N.C. 350, 554 S.E.2d 644 (2001).

The State also presented substantial evidence showing that defendant had the opportunity to murder Ms. Dawson. Because defendant had worked for Ms. Dawson in the past, defendant knew Ms. Dawson and had been inside her house on multiple occasions, giving him the chance to learn the layout of her house and where she kept valuable items, including her jewelry, keys, and bank cards. When Ms. Dawson's body was discovered, investigators found that a pane of glass had been removed from the back door to her house, allowing someone to enter the house easily.

Mr. Sawyer's testimony that defendant sold him jewelry belonging to Ms. Dawson in the days before her murder would allow the jury to find that defendant had been in Ms. Dawson's house on at least two occasions without her knowledge during the days immediately prior to the murder. Moreover, defendant was seen walking near Ms. Dawson's house and had asked for a ride to Flora Street on that Sunday. All of this evidence would permit a jury to conclude that defendant had been entering Ms. Dawson's house in the days before the murder. *See State v. Murphy*, 342 N.C. 813, 820, 467 S.E.2d 428, 432 (1996) (holding State's evidence sufficient to survive motion to dismiss where defendant's house was short walk from murder scene, defendant was aware that he could sneak in and out of plant where murder took place by sliding under certain spot in fence, defendant knew victim would be working alone that night and that front door would be unlocked, and defendant knew where he could find supplies to help him clean up crime scene and protect his clothes from blood).

Mr. Sawyer also testified that defendant sold him more jewelry on Tuesday morning, the day after Ms. Dawson's murder. In addition, Ms. Dawson's car was not parked in its usual spot in her driveway on Monday between 10:00 and 10:30 a.m., and shortly thereafter, defendant was seen driving a car later determined to be Ms. Dawson's car. Ultimately, defendant was found by police as he was trying to wipe down Ms. Dawson's car with a towel while it was parked near his ex-girlfriend's house. A jury could reasonably find, based on defendant's having Ms. Dawson's car Monday morning and his sale of her jewelry Tuesday morning, that defendant returned to the house on Monday morning before 10:00 a.m., the day of the murder.

These facts are very similar to the evidence held sufficient to send the identity of the perpetrator to the jury in *Powell*, 299 N.C. at 101, 261 S.E.2d at 119, in which the elderly victim was found stabbed to death in her home after neighbors became concerned that her car was not parked in its usual spot at her house. The Court concluded that the State presented sufficient evidence that the defendant was the perpetrator based on the following evidence:

> The time of death was likely in the early morning of 15 April 1978. This is consistent with the autopsy report and the fact that a coffee pot Mrs. Walker normally used only in the morning was still on. Shortly after the probable time of death, defendant was seen with Mrs. Walker's car. His fingerprints were found on the rear view mirror. The carving knife missing from the house was found in the car, and also bore defendant's fingerprints. Also, shortly after the probable time of death, defendant delivered the victim's television to his cousins, the McNeills.
>
> Victim's house was locked and windows were unbroken, giving rise to the supposition that Mrs. Walker knew her murderer and let him in. Defendant was known to Mrs. Walker's neighborhood where he had been a visitor to his father and stepmother.
>
> Moreover, when first approached by authorities on this matter, defendant fled. While flight by the defendant does not create a presumption of guilt, it is some evidence which may be considered with other facts and circumstances in determining guilt.

*Id.* at 100-01, 261 S.E.2d at 118.

The evidence in *Powell* parallels that presented in this case. Although the State in *Powell* also had evidence of the defendant's fingerprints on a knife belonging to the victim, there was no contention

that the knife was the murder weapon—the knife was simply a piece of property of the victim's that had been taken by the defendant. As in *Powell*, the State in this case presented evidence of (1) defendant's being in possession of the victim's car shortly after the probable time of her death, (2) defendant's also having possession of other property (jewelry and an ATM card) belonging to the victim that would have likely been taken at the time of the victim's death, (3) defendant's familiarity with the victim's house and access to the house the days before the murder, and (4) defendant's effort to eliminate evidence by wiping down the car and his flight when confronted by police. Based on this evidence, we hold that the State presented substantial evidence of defendant's identity as the perpetrator—including evidence showing both motive and opportunity—such that a reasonable juror could have concluded that defendant was the person who killed Ms. Dawson.

II

**[2]** Defendant also argues that the trial court erred in submitting the charge of first degree murder under the theory of felony murder to the jury because there was insufficient evidence that the murder was committed during the course of or in furtherance of a felony. "First-degree murder by reason of felony murder is committed when a victim is killed during the perpetration or attempted perpetration of certain enumerated felonies or a felony committed or attempted with the use of a deadly weapon." *State v. Gibbs*, 335 N.C. 1, 51, 436 S.E.2d 321, 350 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881, 114 S. Ct. 2767 (1994). "[T]o support convictions for a felony offense and related felony murder, all that is required is that the elements of the underlying offense and the murder occur in a time frame that can be perceived as a single transaction." *State v. Thomas*, 329 N.C. 423, 434-35, 407 S.E.2d 141, 149 (1991).

The State submitted robbery as the underlying felony offense. *See State v. Staten*, 172 N.C. App. 673, 687-88, 616 S.E.2d 650, 660 (explaining that because "[c]ommon law robbery is a lesser-included felony offense of armed robbery[,]" it "can properly serve as the underlying felony for defendant's first-degree felony murder conviction"), *appeal dismissed and disc. review denied*, 360 N.C. 180, 626 S.E.2d 838 (2005), *cert. denied*, 547 U.S. 1081, 164 L. Ed. 2d 537, 126 S. Ct. 1798 (2006). Defendant does not contend that the State failed to present sufficient evidence to support the elements of robbery, but rather argues that the State failed to show that the robbery occurred in the same time frame as Ms. Dawson's death.

The State presented evidence that Ms. Dawson kept her pocketbook next to her armchair when she was sitting in the chair. She usually kept her credit card bills in the pocketbook. When Ms. Dawson's body was found in the armchair, her pocketbook was missing, and her credit card bills and statements were strewn about. A person matching defendant's description was videotaped attempting to use Ms. Dawson's ATM card to withdraw money the day after her death. Investigators later recovered a bag of Ms. Dawson's credit cards in the yard next to the house defendant had visited several times the day after the murder and where he was arrested.

Our appellate courts have held that evidence that a victim's wallet or purse was found emptied at the crime scene is sufficient to show that a robbery occurred at the time of the murder. *See, e.g., State v. Palmer*, 334 N.C. 104, 112-13, 431 S.E.2d 172, 176 (1993) (upholding denial of defendant's motion to dismiss felony murder charge where evidence showed that victim always had money with her, but when victim was found, victim's purse had been emptied and contained no money); *State v. Montgomery*, 331 N.C. 559, 566, 417 S.E.2d 742, 746 (1992) (holding there was substantial evidence to allow jury to find defendant guilty under felony murder theory where pocketbook of victim's roommate had been rifled through and money in pocketbook was missing); *State v. Quick*, 329 N.C. 1, 20; 405 S.E.2d 179, 191 (1991) (holding that State presented sufficient evidence that killing occurred during armed robbery when defendant was borrowing money from friends in days before murder, it was common knowledge that victim carried large amounts of money on his person, victim's billfold was empty when found at murder scene, and defendant was in possession of significant amount of money day after murder).

In sum, we hold that the State's evidence was sufficient to allow a reasonable jury to find that Ms. Dawson was killed during the commission of a robbery. The trial court, therefore, properly denied defendant's motion to dismiss the charge of first degree murder under the felony murder rule.

As we have upheld defendant's murder conviction on the basis of felony murder, we need not reach defendant's argument that the State did not present sufficient evidence of premeditation and deliberation. As the Supreme Court in *State v. Mitchell*, 342 N.C. 797, 813, 467 S.E.2d 416, 425 (1996), explained:

> The jury found defendant guilty on both a theory of felony murder and a theory of premeditation and deliberation. Because we

have found that there is sufficient evidence of the underlying felony to support defendant's conviction of first-degree murder under the felony murder rule, we need not discuss defendant's contention that there was insufficient evidence to convict him of first-degree murder under a theory of premeditation and deliberation. In *State v. Thomas*, 325 N.C. 583, 593, 386 S.E.2d 555, 560-61 (1989), we said, "[p]remeditation and deliberation is a theory by which one may be convicted of first degree murder; felony murder is another such theory. Criminal defendants are not convicted or acquitted of theories; they are convicted or acquitted of crimes." Accordingly, we reject defendant's final argument.

We, therefore, find no error.

No error.

Judges McGEE and BEASLEY concur.