STATE OF NORTH CAROLINA
v.
SCOTT ALLEN FISHER

No. COA12-1404

Filed 6 August 2013

1. **Homicide—involuntary manslaughter—culpable negligence—foreseeability**

    There was sufficient evidence for foreseeability in an involuntary manslaughter prosecution where, after a party, defendant left the injured, intoxicated, and partially clothed victim outside on a cold night. Defendant might not have foreseen that his action would result in the victim's death, but some injury to the victim was foreseeable.

2. **Homicide—involuntary manslaughter—instructions—foreseeability omitted—no plain error**

    There was no plain error in an involuntary manslaughter prosecution where the trial court did not instruct the jury that foreseeability was an essential element of proximate cause, but the State presented overwhelming evidence of foreseeability and it was not probable that the jury would have reached a different result had a proper instruction been given.

Appeal by defendant from judgment entered 18 May 2012 by Judge Bradley B. Letts in Henderson County Superior Court. Heard in the Court of Appeals 24 April 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Jason T. Campbell, for the State.*

*Duncan B. McCormick for Defendant-appellant.*

STATE v. FISHER

[228 N.C. App. 463 (2013)]

ERVIN, Judge.

Defendant Scott Allen Fisher appeals from a judgment sentencing him to a term of 19 to 23 months imprisonment based upon his conviction for involuntary manslaughter. On appeal, Defendant argues that the trial court erred by denying his motion to dismiss for insufficiency of the evidence and committed plain error by failing to instruct the jury that "foreseeability was an essential element of proximate cause where the decedent froze to death." After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that the trial court's judgment should remain undisturbed.

## I.  Factual Background

### A.  Substantive Facts

#### 1.  State's Evidence

Sixteen year old Michael Scott Rogers died on or about 20 February 2010 after attending a party hosted by Defendant at the residence in which he lived with his parents. Krista Rickards, who had known Defendant for several years, was at the party with several of her friends. Although she was under-aged, Ms. Rickards consumed mixed drinks at the party. Another guest, eighteen year old Brittany Phillipson, recalled that the guests were drinking and using marijuana in addition to "pills and other stuff."

According to Ms. Rickards, Mr. Rogers was "very intoxicated" and belligerent, telling his fellow guests that he had been in two mental institutions and that he was addicted to drugs. While she was at the party, Ms. Phillipson saw Mr. Rogers on the floor and bleeding as a result of the fact that Defendant had "kicked or stomped" his face. At the time of her departure, Ms. Phillipson noticed that Mr. Rogers was "kind of coming in and out of consciousness" and that one of her friends was cleaning his face.

At around 11:00 p.m., Mr. Rogers made two calls to his mother. During the first call, his speech was slurred and he asked for his mother and stepfather, Robert Leonard, to come pick him up. At the time that he called back a few minutes later, Mr. Rogers was crying. When Ms. Leonard asked him where he was, Mr. Rogers replied "I don't know. They done beat the hell out of me. I'm laying here and I'm bleeding all over, and I just pray to God they don't come back and kill me." After receiving this information and learning where Mr. Rogers was,

Mr. Leonard arranged to pick Mr. Rogers up at Blantyre Baptist Church, which is located on Kings Road, a short distance from the site of the party and near the dividing line between Henderson and Transylvania Counties. After speaking with Mr. Rogers, Ms. Leonard called 911 and asked someone from the Sheriff's Department to meet them at the church. At about this time, the remaining guests concluded that investigating officers would soon arrive at the party and dispersed.

The night on which the party occurred was very cold, with temperatures in the 20s. Mr. and Ms. Leonard, as well as Mr. Rogers' father, Brian Rogers, arrived at Blantyre Baptist Church a few minutes after speaking with Mr. Rogers. However, Mr. Rogers never appeared at that location. As a result, the Leonards and Brian Rogers checked nearby houses and waited at the church for several hours.

In light of Mr. Rogers' failure to appear at the Blantyre Baptist Church, a number of law enforcement officers began searching for him. Sergeant Chris Hawkins of the Transylvania County Sheriff's Department spoke with someone who been guest at the party and who led him to Defendant's house, which was located about a quarter mile from Blantyre Baptist Church. At the time that he arrived at Defendant's residence, Sergeant Hawkins observed blood droplets in front of the house. In the meantime, after listening to a conversation between Mr. Rogers and a 911 dispatcher, Lieutenant Kevin Holden of the Transylvania County Sheriff's Department decided that Mr. Rogers needed to be found quickly so that he could be "provide[d with] immediate medical attention." After meeting Sergeant Hawkins at Defendant's house and examining the blood drops that Sergeant Hawkins had detected outside that structure, Lieutenant Holden determined that exigent circumstances justified the making of an entry into the house for the purpose of determining whether Mr. Rogers was inside. Although they did not find anyone in the residence, the investigating officers did observe a bloodied towel during their attempt to find Mr. Rogers. Deputy Terrell Scruggs and Detective John Nicholson of the Transylvania County Sheriff's Department took possession of items found at Defendant's house and noted that the outside temperature was approximately 28 degrees Fahrenheit shortly before 5:00 a.m.

After determining that Mr. Rogers was not in Defendant's house, Lieutenant Holden talked with Defendant's father, Shawn Fisher, by telephone and asked him to contact Defendant for the purpose of ascertaining if Defendant knew where Mr. Rogers was. A short time later, Mr. Fisher called back and reported that Defendant had told him that he had dropped Mr. Rogers off at the end of the Fisher's driveway. Although

investigating officers searched the area in question, they did not find Mr. Rogers.

At that point, Lieutenant Holden had a second conversation with Mr. Fisher, who suggested that Defendant might be with a woman named Ashley who drove a silver Volkswagen and lived in an apartment on King Street in Brevard. As a result, investigating officers went to the King Street address, arriving shortly after 3:00 a.m. Upon arriving at the King Street apartment, they located the silver Volkswagen, upon which and in which Deputy Scruggs observed "blood spatter spots" and bloodstains.

After entering Ashley's apartment, the investigating officers spoke with several people, including Defendant. Richard Thomas, who was one of the persons present in the apartment, told Lieutenant Holden that he had been at the party at Defendant's house; that he had gotten into a fight with Mr. Rogers; that, after the party had come to an end, they had driven Mr. Rogers a short distance; that Mr. Rogers had exited the car at the intersection of Highway 64 East and King Road and walked towards the bridge; and that the group had not seen him since that time. Defendant told Lieutenant Holden that he had been driving when Mr. Rogers left the car.

After conversing with Mr. Thomas and Defendant, Sergeant Hawkins and Deputy Scruggs went to the intersection of King Road and Highway 64. At that point, the weather was "[f]reezing cold." Upon reaching the intersection, Sergeant Hawkins searched a boat access area near Grove Bridge Road, which was just across the Henderson County line. After securing the silver Volkswagen, Lieutenant Holden joined the search.

At approximately 4:00 a.m., investigating officers found a broken taillight lens and more blood drops. In addition, the investigating officers observed oil near the blood spots and ascertained that the blood and oil which they discovered on the ground coincided with the locations of an oil leak and blood spots that were detected on the silver Volkswagen. Upon determining that they had crossed the county line, the investigating officers contacted Henderson County law enforcement officials. As a result, Corporal Breena Williams of the Henderson County Sheriff's Department was dispatched to the Grove Bridge boat access area at around 7:00 a.m. on 21 February 2010, at which point she collected physical evidence, including blood swabbings and pieces of a taillight lens.

After agreeing to speak with investigating officers, Defendant was interviewed by Brian Kreigsman, who was, at that time, the chief

**STATE v. FISHER**

[228 N.C. App. 463 (2013)]

detective for the Transylvania Sheriff's Department. Initially, Defendant told Detective Kreigsman that, when the party broke up, he gave Mr. Rogers a ride to the intersection of Highway 64 and King Road and that he had last seen Mr. Rogers walking from that location towards the Grove Bridge. As a result of the fact that investigating officers had found evidence at the boat access area, Detective Kreigsman challenged the truthfulness of Defendant's account. In response, Defendant "admit[ted] that, yes, they had gone to the bridge"; that Defendant had been "driving the car"; that, when they parked at the bridge, he "couldn't get [Mr. Rogers] out of the car"; that Mr. Rogers "was spitting, wanting to fight"; and that "they fought back and . . . punched and kicked him." However, Defendant claimed that Mr. Rogers "was still breathing" at the time that Defendant got back into the car. In addition, Defendant provided a written statement in which he stated that "I was chillin with some friends, and my next thing I know people hit [Mr. Rogers] a bunch. And we took him to the bridge and left, and I threw him out." Detective Kreigsman took "a picture of [Defendant's] hand showing abrasions, bruising on his knuckles."

In the meantime, investigating officers continued to search for Mr. Rogers. Shortly before noon on 21 February 2010, Lieutenant Holden, while using binoculars to scan the area, saw Mr. Rogers' body, in "jeans and no shirt, lying on his back in the field" about a hundred yards from the boat access. The field in which Mr. Rogers' body was found was used to pasture pigs, which were precluded from interfering with his body by a guard dog. Agent Casey Drake of the State Bureau of Investigation, who assisted in the processing of the area where Mr. Rogers' body was found, observed that the field in question contained "pigs of all sizes, miniature horses, [and] goats" and was enclosed by two fences. An examination of Mr. Rogers' body revealed the presence of "dried blood around his mouth and nose and face and bruises and scrapes all over him."

During the course of their investigation, investigating officers took a statement from Ms. Rickards, who indicated that Defendant was angry at having to take Mr. Rogers to the church to meet his parents because he had been drinking and did not want to drive. Ms. Rickards spoke with Defendant by telephone several hours after the party ended, at which point he told her that "he had taken [Mr. Rogers] out into the middle of nowhere and beat the s**t out of him." When Ms. Rickards asked Defendant "what he thought would happen when [Mr. Rogers] woke up, [Defendant] told [her] that he didn't know if he would."

Dr. Donald Jason, M.D., an expert in forensic pathology who performed an autopsy on Mr. Rogers' body, noted "many abrasions and

bruises over [Mr. Rogers'] face, chest, the back and the arms and the legs." However, Dr. Jason determined that Mr. Rogers did not have any fractures or internal injuries and characterized the abrasions and bruises as "superficial." Although toxicology reports indicated that Mr. Rogers had consumed alcohol, no traces of illegal drug use were detected. An internal examination revealed the presence of hemorrhaging to the stomach lining that was consistent with death resulting from exposure. According to Dr. Jason, Mr. Rogers "died of hypothermia" "because he was in a cold environment for a period of time[.]"

### 2. Defendant's Evidence

On 20 February 2010, Defendant was nineteen years old and lived with his parents. Defendant's parents were working out of town, so he asked some friends to come over to his residence. Defendant did not know Mr. Rogers and had not invited him to come to his home. At the time that Mr. Rogers arrived with Coley Hall, one of Defendant's friends, Mr. Rogers was acting "wild." In addition, Defendant was intoxicated, having drunk about ten shots of vodka and smoked marijuana during the party.

As the party progressed, several female guests made complaints to Defendant about Mr. Rogers' behavior. In response to those complaints, Defendant and Mr. Thomas took Mr. Rogers aside and asked him to "calm down." At that point, Mr. Rogers became aggressive and had a brief fight with Mr. Thomas, which Defendant broke up after Mr. Rogers suffered a cut lip. Once the fight was over, Defendant took Mr. Rogers inside, cleaned his injury, and suggested that he rest in Defendant's bedroom before rejoining the party.

About twenty minutes later, Mr. Rogers reappeared and announced that he had "called the cops on you-all." Defendant was angered by Mr. Rogers' action given that he was on probation for felonious possession of marijuana. After Mr. Rogers spit in Defendant's face, Defendant "threw the first punch," at which point the two men "got into a little scuffle." As soon as Mr. Rogers fell, Defendant "hit him two to three more times" and then "got up and walked outside." Although Defendant admitted having struck Mr. Rogers several times, he denied having kicked or stomped him in the face.

After his fight with Mr. Rogers, Defendant asked everyone to leave. In light of that request, the party began to break up. Several minutes later, Mr. Rogers emerged from Defendant's house, took off his shirt, and "proceeded to beat on his chest." At that time, Mr. Rogers was bleeding from the "lip and nose area." Although he was angry, Defendant told

Mr. Rogers that he would take him home after his great-uncle "calmed [him] down." Upon receiving this information, Mr. Rogers got into a silver vehicle owned by Defendant's friend Ashley and driven by Mr. Hall. In the car, Defendant occupied the front seat while Mr. Rogers and two girls were seated in the back seat.

After leaving Defendant's residence, the group traveled past Blantyre Baptist Church and turned onto King Road. As they drove down the road, Mr. Rogers was beating Defendant and Mr. Hall on the back of the head. Since Mr. Rogers wanted to get out of the car, Defendant directed Mr. Hall to drive to the boat access area near the Grove Bridge. Defendant selected this location because he knew that the area was lighted and because he was intoxicated and felt that the group was less likely to encounter law enforcement officers on a side road as compared to a principal highway.

As the group reached the boat access parking lot, Mr. Rogers, who was continuing to shout, got out of the car. Neither Defendant nor Mr. Hall fought with Mr. Rogers at the time they that let him out of the car. As they left the parking lot, Defendant, who had assumed responsibility for driving, backed the car into a telephone pole before taking the group to Brevard.

Subsequently, Defendant received a phone call from his father, who inquired about Mr. Rogers' whereabouts. Defendant told his father where the group had let Mr. Rogers out of the car. Defendant denied knowing how blood got onto the car, that there was any plan to leave Mr. Rogers at Blantyre Baptist Church, conversing about the incident with Ms. Rickards, or speaking with Lieutenant Holden. However, Defendant did admit that he never called 911 in order to seek assistance for Mr. Rogers despite the fact that Mr. Rogers was intoxicated, shirtless, and had been in a fight at the time that they dropped him off at the boat access.

At around 11:30 p.m. on 20 February 2010, Mr. Fisher and his wife were driving their tractor-trailer rig in Pennsylvania, when Mr. Fisher received a phone call from his uncle, who lived next door to the family residence. Upon learning that there was a "loud party" at his residence, Mr. Fisher asked his uncle to break up the function. A few minutes later, Mr. Fisher spoke by phone with Lieutenant Holden, who told him that investigating officers were looking for Mr. Rogers. Mr. Fisher authorized investigating officers to look for Mr. Rogers in his house and then called Defendant, who told him that they had "set [Mr. Rogers] out at the end of our road."

About thirty minutes later, Mr. Fisher received another call from Lieutenant Holden, who told him that they had been unable to locate Mr. Rogers and asked him to contact Defendant again for the purpose of obtaining more specific directions. As a result, Mr. Fisher called Defendant and told him that the investigating officers were "getting concerned about [Mr. Rogers] and [] needed to know exactly where [the group] had set him out." At that point, Defendant told his father that they had let Mr. Rogers out of the car at the boat access. Upon obtaining this information, Mr. Fisher passed it along to Lieutenant Holden. According to Mr. Fisher, Defendant sounded intoxicated.

### B. Procedural History

On 19 January 2011, the Henderson County grand jury returned a bill of indictment charging Defendant with involuntary manslaughter. The charge against Defendant came on for trial before the trial court and a jury at the 14 May 2012 criminal session of the Henderson County Superior Court. On 18 May 2012, the jury returned a verdict convicting Defendant as charged. At the conclusion of the ensuing sentencing hearing, the trial court entered a judgment sentencing Defendant to a term of 19 to 23 months imprisonment. Defendant noted an appeal to this Court from the trial court's judgment.

### II. Legal Analysis

### A. Sufficiency of the Evidence

In his first challenge to the trial court's judgment, Defendant contends that the trial court erred by denying his motion to dismiss the involuntary manslaughter charge that had been lodged against him. More specifically, Defendant contends that the trial court erred by denying his dismissal motion on the grounds that "the evidence did not show that [Defendant] committed a culpably negligent act or omission that proximately caused [Mr. Rogers] to freeze to death." We do not find this argument persuasive.

### 1. Standard of Review

The standard of review utilized in reviewing challenges to the denial of a motion to dismiss for insufficiency of the evidence is well established:

> When reviewing a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines whether the State presented substantial evidence in support of each element of the charged offense.

> Substantial evidence is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion. In this determination, all evidence is considered in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence. The defendant's evidence, unless favorable to the State, is not to be taken into consideration, except when it is consistent with the State's evidence, the defendant's evidence may be used to explain or clarify that offered by the State. Additionally, a substantial evidence inquiry examines the sufficiency of the evidence presented but not its weight, which is a matter for the jury. Thus, if there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied."

*State v. Abshire*, 363 N.C. 322, 327-28, 677 S.E.2d 444, 449 (2009) (citations and quotation marks omitted). "When reviewing a defendant's motion to dismiss, this Court determines only whether there is substantial evidence of (1) each essential element of the offense charged and of (2) the defendant's identity as the perpetrator of the offense. Whether the evidence presented at trial is substantial evidence is a question of law for the court." *State v. Miles*, __ N.C. App __, __, 730 S.E.2d 816, 822 (2012) (citing *State v. Lowry*, 198 N.C. App. 457, 465, 679 S.E.2d 865, 870, *cert. denied*, 363 N.C. 660, 686 S.E.2d 899 (2009)), and *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651-52 (1982)), *aff'd*, __ N.C. __, __ S.E.2d __, 2013 N.C. LEXIS 342 (2013). "Appellate review of a denial of a motion to dismiss for insufficient evidence is *de novo*." *State v. Boozer*, 210 N.C. App. 371, 374-75, 707 S.E.2d 756, 761 (2011) (citing *State v. Robledo*, 193 N.C. App. 521, 525, 668 S.E.2d 91, 94 (2008)), *disc. review denied*, __ N.C. __, 720 S.E.2d 667 (2012). We will now proceed to apply this standard of review in evaluating Defendant's challenge to the denial of his dismissal motion.

### 2. Correctness of Trial Court's Ruling

[1] "The elements of involuntary manslaughter are: (1) an unintentional killing; (2) proximately caused by either (a) an unlawful act not amounting to a felony and not ordinarily dangerous to human life, or (b) culpable negligence." *State v. Hudson*, 345 N.C. 729, 733, 483 S.E.2d 436, 439 (1997) (citing *State v. McGill*, 314 N.C. 633, 637, 336 S.E.2d 90, 92 (1985)). "Proximate cause is a cause that produced the result in

continuous sequence and without which it would not have occurred, and one from which any man of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed. Foreseeability is an essential element of proximate cause. This does not mean that the defendant must have foreseen the injury in the exact form in which it occurred, but that, in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected. *State v. Powell*, 336 N.C. 762, 771-72, 446 S.E.2d 26, 31 (1994) (quoting *Williams v. Boulerice*, 268 N.C. 62, 68, 149 S.E.2d 590, 594 (1966) (other citations omitted)). The ultimate issue raised by Defendant's challenge to the denial of his dismissal motion is whether the record contains sufficient evidence to permit a reasonable jury to conclude that Defendant committed a culpably negligent act which proximately resulted in Mr. Rogers' death.

The record, when considered in the light most favorable to the State, contains evidence from which a reasonable jury might find (1) that Defendant became angry at Mr. Rogers during his party and "kicked or stomped" his face, leaving Mr. Rogers semi-conscious; (2) that Defendant was irritated that Mr. Rogers had arranged to meet his parents at Blantyre Baptist Church and at the necessity for him to be involved in taking Mr. Rogers there; (3) that, instead of taking Mr. Rogers at the church to meet his parents, Defendant drove Mr. Rogers to an isolated parking area at the boat access, at which point he "beat the s**t out of" Mr Rogers; (4) that Defendant abandoned Mr. Rogers at the boat access despite knowing that the temperature was in the 20s and that Mr. Rogers had been beaten, was intoxicated, and was not wearing a shirt; (5) that Defendant realized that his actions had placed Mr. Rogers in jeopardy, as evidenced by his statement to Ms. Rickards that he did not think Mr. Rogers would wake up and by his statement to Detective Kreigsman that Mr. Rogers was "still breathing" when Defendant left him at the boat access area; and (6) that, even after being directly informed by his father that Mr. Rogers was missing and that investigating officers were concerned about him, Defendant lied about where he had last seen Mr. Rogers, effectively hindering the efforts being made to locate Mr. Rogers and to obtain medical assistance for him. We have no difficulty in concluding that the record contains sufficient evidence to permit a determination that Defendant's actions were culpably negligent and that "[D]efendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." *Powell*, 336 N.C. at 771-72, 446 S.E.2d at 31. As a result, we conclude that the record contained sufficient evidence to

support the submission of the issue of Defendant's guilt of involuntary manslaughter to the jury.

In seeking to persuade us to reach a contrary conclusion, Defendant argues that, while he "may have struck, punched, and kicked" Mr. Rogers, his assault on Mr. Rogers did not constitute a "culpably negligent act" because the "blows did not cause the death." Although Mr. Rogers did not die as the result of the injuries that he received during the assault that Defendant committed upon him, this fact does not justify a decision to overturn the trial court's judgment given that the culpably negligent act which Defendant committed and which led to Mr. Rogers' death was his action in putting Mr. Rogers out of the car in an injured, intoxicated, and under-clothed condition on a very cold night. Similarly, Defendant's contention that, despite the fact that he "let [Mr. Rogers] out of the car on a very cold night and left him at the river access knowing that [Mr. Rogers] was intoxicated and knowing he was not wearing a shirt," "it was not reasonably foreseeable [that Mr. Rogers] would wander into a muddy pig field and die of hypothermia," is not persuasive given that Defendant's argument overlooks the fact that the foreseeability requirement "does not mean that the defendant must have foreseen the injury in the exact form in which it occurred[.]" *Id.* Although Defendant might not have foreseen that his decision to leave Mr. Rogers outside on a cold night in an injured, intoxicated, and partially clothed condition would result in his death, it is hard to reach any conclusion other than that some injury to Mr. Rogers was foreseeable, if not almost preordained, in light of that decision.

The deficiency in the logic upon which Defendant[1] relies is illustrated in our recent decision in *State v. Pierce*, __ N.C. App __, 718 S.E.2d 648 (2011), *disc. review denied*, 365 N.C. 560, 723 S.E.2d 769, *cert. denied*, __ U.S. __, 133 S. Ct. 378, 184 L. Ed. 2d 223 (2012), in which the defendant drove away from a law enforcement officer's attempt to initiate a traffic stop. Another officer, who responded to the original officer's radio request for assistance, lost control of his car and died as a result of injuries sustained in a crash while driving to the assistance of his colleague. Defendant was convicted, among other things, of second degree murder as a result of his involvement in this incident. On appeal, Defendant argued that "there was insufficient evidence that his flight

---

1. Although Defendant argues both that his conduct was not culpably negligent and that his conduct was not a proximate cause of Mr. Rogers' death, the essential thrust of his argument with respect to both of these issues is that Mr. Rogers' death was not a foreseeable consequence of his conduct. As a result, Defendant ultimate makes only one, instead of two, arguments in support of his challenge to the denial of his dismissal motion.

from [the original law enforcement officer] was the proximate cause of [the assisting officer's] death." We rejected this argument, stating that:

> [T]he evidence, viewed in the light most favorable to the State, shows that [Defendant] fled from [the arresting officer's] attempted lawful stop[;] . . . that [the assisting officer] . . . sped to provide assistance and apprehend [Defendant]; [and] that on his way, [the assisting officer] . . . perished after unsuccessfully attempting to avoid [an] obstruction. In our view, this evidence was sufficient to allow a reasonable jury to conclude (1) that [the assisting officer's] death would not have occurred had [Defendant] remained stopped after [the arresting officer] pulled him over, and (2) that an injurious result such as [the assisting officer's] death was reasonably foreseeable under the circumstances. . . . [W]e overrule [Defendant's] argument that . . . there was insufficient evidence to show that [Defendant's] flight proximately caused [the assisting officer's] death.

*Pierce*, __ N.C. App at __, 718 S.E.2d at 652-53. As a result, we held in *Pierce* that the State did not need to prove that it was foreseeable that another officer would decide to assist the original arresting officer and then die in a vehicular accident while coming to that other officer's aide in order for a guilty verdict to be properly returned; instead, we only required that it be foreseeable that "an injurious result," such as the assisting officer's death, was foreseeable. On the basis of similar logic, we conclude that "an injurious result" such as Mr. Rogers' death from hypothermia or some similar injurious result was reasonably foreseeable as a result of Defendant's decision to leave Mr. Rogers at the boat access area under the circumstances described above.[2]

Although Defendant cites several cases in his brief addressing the sufficiency of the evidence of a defendant's guilt of involuntary manslaughter, each of these decisions involves accidental conduct on the part of the defendant, such as the defendant's involvement in a hunting accident. The present record is, however, devoid of any indication that Mr. Rogers' death stemmed from accidental or unintentional conduct on Defendant's part. Instead, the State's evidence tends to show that Mr.

---

2. As an aside, we note that the record contains evidence tending to show that Defendant did in fact foresee the possibility that the consequences of his actions would result in Mr. Rogers' death given his statement to Ms. Rickards that he did not think that Mr. Rogers would "wake up."

Rogers' death resulted from intentional conduct, including Defendant's decisions to beat Mr. Rogers until he was semi-conscious; to leave him at an isolated location in freezing weather and in an injured, intoxicated, and shirtless condition; and to lie to the investigating officers who were searching for Mr. Rogers. In other words, the culpable negligence that underlies Defendant's conviction stems from intentional, rather than unintentional, conduct on Defendant's part. Thus, we do not find cases addressing death caused by inadvertent or accidental actions to be particularly relevant, much less controlling, in addressing the issue that Defendant has brought forward for our consideration.[3] As a result, we conclude that there was sufficient evidence to support the submission of the issue of Defendant's guilt of involuntary manslaughter to the jury and that the trial court did not err by denying Defendant's dismissal motion.

## B. Foreseeability Instruction

**[2]** Secondly, Defendant argues that the trial court "committed plain error by failing to instruct the jury that foreseeability was an essential element of proximate cause[.]" More specifically, Defendant contends that "the court's failure to instruct the jury that foreseeability was an element of proximate cause is error so fundamental as to amount to a miscarriage of justice and error which probably resulted in the jury reaching a different verdict than it otherwise would have reached." We do not believe that Defendant's argument has merit.

" 'A trial judge is required . . . to instruct the jury on the law arising on the evidence. This includes instruction on the elements of the crime. . . . Failure to instruct upon all substantive or material features of the crime charged is error.' " *State v. Aguilar-Ocampo,* __ N.C. App __, __, 724 S.E.2d 117, 124 (2012) (quoting *State v. Bogle,* 324 N.C. 190, 195, 376 S.E.2d 745, 748 (1989)). As Defendant correctly observes, " '[f]oreseeability is an essential element of proximate cause[.]' " *State v. Leonard,* __ N.C. App __, __, 711 S.E.2d 867, 871 (quoting *Powell* at 771-72, 446 S.E.2d at 31), *disc. review denied,* 365 N.C. 353, 717 S.E.2d 746 (2011). For that reason, a trial judge should, as a general proposition, incorporate a foreseeability instruction into its discussion of the issue of proximate cause when the record reflects the existence of a genuine

---

3. In addition, Defendant directs our attention to cases from other jurisdictions addressing manslaughter charges that had been lodged against a defendant in a variety of factual contexts. "[T]hese cases from other jurisdictions are certainly not controlling on this Court," *Skinner v. Preferred Credit,* 361 N.C. 114, 126, 638 S.E.2d 203, 212 (2006), *disc. review denied,* 361 N.C. 371, 643 S.E.2d 591 (2007), and we are not persuaded by their holdings that Defendant is entitled to relief given the well-established principles of North Carolina law discussed in the text.

issue as to whether the injury which resulted from a defendant's allegedly unlawful conduct was foreseeable. *See State v. Hall,* 60 N.C. App. 450, 455, 299 S.E.2d 680, 683 (1983) (holding that, in a case in which the defendant was charged with involuntary manslaughter based on an accidental shooting which occurred while the defendant was hunting, the trial court erred by denying the defendant's request for an instruction concerning foreseeability).

At trial, Defendant did not request an instruction concerning the foreseeability issue or object to the absence of a foreseeability instruction from the trial court's jury charge. In cases in which "a defendant fails to request an instruction, 'we will review the record to determine if the instruction constituted plain error. . . .' " *State v. Ramseur,* __ N.C. App __, __, 739 S.E.2d 599, 606 (2013) (quoting *State v. Hardy,* 353 N.C. 122, 131, 540 S.E.2d 334, 342 (2000) (internal citations and quotation marks omitted), *cert. denied,* 534 U.S. 840, 122 S. Ct. 96, 151 L. Ed. 2d 56 (2001)), *disc. review denied,* __ N.C. __, __ S.E.2d __, 2013 N.C. Lexis 605 (2013). "For error to constitute plain error, a defendant must demonstrate that . . . after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " *State v. Lawrence,* 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (quoting *State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir. 1982), *cert. denied,* 459 U.S. 1018, 103 S. Ct. 381, 74 L. Ed. 2d 513 (1982)).

> The plain error rule applies only in truly exceptional cases. Before deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C. [Gen. Stat.] § 15A-1443 upon defendants who have preserved their rights by timely objection.

*State v. Walker,* 316 N.C. 33, 39, 340 S.E. 2d 80, 83 (1986) (citing *Odom,* 307 N.C. at 661, 300 S.E. 2d at 378-79, and quoting *State v. Black,* 308 N.C. 736, 741, 303 S.E. 2d 804, 806-07 (1983)). As a result of the fact that Defendant did not request the trial court to instruct the jury on the foreseeability issue or object to the omission of such an instruction from the trial court's charge, we review Defendant's challenge to the trial court's instructions using a plain error standard of review.

**STATE v. FISHER**

[228 N.C. App. 463 (2013)]

An outcome is foreseeable when "a person of ordinary prudence would reasonably have foreseen [it] as the probable consequence of his acts." *Bogle v. Power Co.*, 27 N.C. App. 318, 321, 219 S.E.2d 308, 310 (1975) (citing *Luther v. Contracting Co.*, 268 N.C. 636, 642, 151 S.E. 2d 649, 653-54 (1966)), *disc. review denied*, 289 N.C. 296, 222 S.E.2d 695 (1976). As we have previously discussed, the foreseeability component of the proximate cause requirement "does not mean that the defendant must have foreseen the injury in the exact form in which it occurred, but that, in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." *Powell*, 336 N.C. at 771-72, 446 S.E.2d at 31. At trial, Defendant admitted that he had fought with Mr. Rogers. In addition, the undisputed evidence established that Defendant left Mr. Rogers at a relatively isolated boat access late at night in below-freezing weather despite his knowledge that Mr. Rogers was bleeding, intoxicated, and shirtless. Even if the jury chose not to believe the evidence tending to show that Defendant had "kicked or stomped" Mr. Rogers' face and that he opined that Mr. Rogers might never "wake up," we conclude that the State presented overwhelming evidence tending to show that Defendant "might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." *Id.* In addition, given the substantial and largely uncontradicted evidence tending to show that Defendant's actions were culpably negligent and the overwhelming evidence tending to show that "some injurious result" was foreseeable as a result of Defendant's conduct, we conclude that it is not probable that the jury would have reached a different result had a proper foreseeability instruction been given. As a result, Defendant has failed to establish that the omission of a discussion of the issue of foreseeability from the trial court's instructions constituted plain error, so Defendant is not entitled to relief based on this argument.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that neither of Defendant's challenges to the trial court's judgment have merit. As a result, the trial court's judgment should, and hereby does, remain undisturbed.

NO ERROR.

Judges ROBERT C. HUNTER and STROUD concur.